**In re CONSOLIDATED PIONEER MORTGAGE ENTITIES,**
Debtor.

**Pioneer Liquidating Corporation,**
**Appellant,**

v.

**United States Trustee, Appellee.**

**BAP No. SC–99–1158–MaPRy.**
**Bankruptcy No. 91–00214–M11.**

United States Bankruptcy Appellate Panel of the Ninth Circuit.

Argued and Submitted Sept. 22, 1999.

Decided April 11, 2000.

Howard J. Barnhorst, II, Barnhorst, Schreiner & Goonan, San Diego, CA, for Pioneer Liquidating Corporation.

Mary M. Testerman, San Diego, CA, for United States Trustee.

Before MARLAR, PERRIS and RYAN, Bankruptcy Judges.

## OPINION

MARLAR, Bankruptcy Judge.

### OVERVIEW

Appellant Pioneer Liquidating Corporation ("PLC") was formed in 1992 to imple-

ment the confirmed Joint Plan in the consolidated debtors' bankruptcy case. In 1998, the bankruptcy court granted the United States Trustee's motion to convert the case to chapter 7,[1] a motion that was prompted, in part, by the investor claimants' dissatisfaction with their distributions to date. The conversion order, among other things, required PLC to file accountings of its receipts and disbursements. PLC contends that the bankruptcy court abused its discretion by converting the case for cause, and that PLC was an independent corporation which was not answerable to the court. We are not persuaded by PLC's arguments, and AFFIRM.

## FACTS

### A. The Joint Plan

On January 9, 1991, six debtors filed voluntary petitions for relief under chapter 11.[2] Consolidated Pioneer Mortgage Entities ("Debtor") was the umbrella name for the debtors whose cases were substantively consolidated. Prepetition, Debtor sold fractionalized interests in promissory notes and security agreements or deeds of trust to approximately 2,800 investors. At the time of the bankruptcy, the investors were fragmented, and disputes arose concerning their expected returns.

The Debtor and the Official Creditors' Committee filed a Joint Plan of Reorganization, as Amended, ("Joint Plan"). One of the purposes of the reorganization was to resolve differences among the fragmented investors and Debtor by treating all investors equally and by operating independently of the conflicting investor factions. Thus, PLC was created under the Joint Plan to take title to all of the estate assets and claims, including claims against third parties. Article 5 of the Joint Plan

provided that title to all the investor interests and assets of the estate "shall automatically vest in the Liquidating Corporation as of the Effective Date." Joint Plan at 23.

The investors were not given any ownership or voting interest in PLC. The Joint Plan called for the voluntary transfer to PLC of any and all investors' interests in the notes and deeds of trusts as well as any proceeds thereof, in exchange for a right to payment from PLC, to be satisfied from PLC's assets based on each investor's net loss.

PLC consisted of a seven-member board of directors, whose members were authorized to serve for five years, or longer with court approval. The directors were also shareholders in the new corporation. PLC was given the authority to compensate its CEO, directors, and employees, and by the time of this appeal, it had expended hundreds of thousands of dollars on salaries and attorneys' fees.

The Joint Plan defined PLC as the "Liquidating Corporation ... formed to operate in a manner to implement and fulfill the purposes of the Plan," which were: (1) to take title to, and liquidate all of the assets of the debtors and the alleged investor interests; (2) to resolve claims disputes; and (3) to disburse to creditors and investors their entitlements under the Joint Plan. Joint Plan at 2, 11.

PLC's broad duties and powers included, among other things, management and disposition of all estate properties, compromise of claims, examination of and objection to proofs of claims, and employment of professionals. PLC was further charged:

> (e) To pursue all actions necessary or appropriate to collect indebtedness
>
> . . . .

\* \* \* \* \* \*

---

**1.** Unless otherwise indicated, all references to "chapter" or "Code" are to the Bankruptcy Code, 11 U.S.C. §§ 101–1330, while references to "Fed.R.Bankr.P." are to the Federal Rules of Bankruptcy Procedure, which make applicable certain Federal Rules of Civil Procedure ("Fed.R.Civ.P.").

**2.** The debtors were Naiman Financial Corp; Naimpro, Inc.; Naimco–Clairemont, Inc.; Naimco, Inc.; Alvarado Investment Corp., Inc.; and Frontier Service Corp.

(n) To investigate and/or pursue or terminate actions on behalf of the Estates of the Debtors where appropriate and cost-effective.

(o) To disburse to Creditors and Investors their entitlements under the Plan.

Joint Plan at 23–30.

In soliciting for the Joint Plan, PLC sent correspondence to the investors which projected a return on their claims of 35 cents on the dollar. In addition, PLC stated that the unconditional transfer of assets to PLC gave the investors the best chance to claim over $100 million in tax deductible losses immediately in 1992, by vesting the ownership of PLC solely in the board of directors.

The Joint Plan was overwhelmingly accepted by the investors, and was confirmed on June 19, 1992. Post-confirmation, the six debtors were dissolved under California law.

### B. Post–Confirmation Activity

The disclosure statement and Joint Plan did not guarantee a specific amount of distribution to the investors. The parties in interest understood that "the whole basis of this plan is an opinion ... an estimate of what could be done by this liquidating entity." Transcript of May 5, 1992 hearing on Disclosure Statement at 60.

The method of payment to the investors was to be by a *pro rata* distribution of the proceeds from the liquidation of Debtors' assets that were not otherwise utilized or expended to implement the Joint Plan, such as those needed for operating expenses. Following an initial distribution, investors who voted for the Joint Plan were to receive payments as soon as the amount of unrestricted available cash equaled or exceeded $1,000,000. PLC was also required to place all proceeds on account of non-electing investors into an interest-bearing trust account.

Article 12 of the Joint Plan expressly provided for the court's retention of broad jurisdiction, including, in paragraph (G), that the bankruptcy court would retain jurisdiction over "all controversies, suits and disputes that may arise in connection with the interpretation, enforcement or consummation of this Plan, including, without limitation, the actions of the Board of Directors and the shareholders of the Liquidating Corporation."

At the time of plan confirmation, Debtors' assets were valued at approximately $80 million. Within the first five years of the Joint Plan, virtually all existing assets had been liquidated. PLC distributed more than $21.6 million to the investors. In addition, the investors had been able to claim deductible losses of more than $100 million in 1992. PLC had also made the required distribution to the general unsecured creditors, and the final distribution to that class was approved by the bankruptcy court on September 30, 1994.

Still, PLC anticipated a future income from its largest potential asset—a pending, estimated $125 million dollar lawsuit brought by PLC against San Diego Trust & Savings Bank and its successors in interest by merger, First Interstate Bank of California and Wells Fargo Bank ("the bank litigation"). These claims arose pre-confirmation.[3]

In addition, PLC anticipated a benefit to the investors from reported losses in connection with the disposition of its assets, including a federal net operating loss ("NOL") carryover of approximately $31.3 million on its federal income tax return for fiscal year ending June 30, 1996. PLC

---

**3.** In January of 1999, the Ninth Circuit Court of Appeals reversed a summary judgment and dismissal of certain of PLC's claims, enabling PLC to continue to prosecute its conspiracy-to-defraud and negligence claims against the bank.

PLC also had a pending post-confirmation malpractice action against its former attorneys in the bank litigation that was stayed during the time the bank litigation was on appeal.

alleged that the NOL could result in a tax savings of more than $12.1 million.

Due to the nature of the payments made upon liquidation of assets, over the years of the Joint Plan's existence, the investors and the United States Trustee made certain requests of PLC to provide financial information. Considering itself to be an independent entity with no express reporting requirements, PLC was unresponsive to such requests. PLC maintained that any disclosure of financial information would jeopardize its position in the bank litigation. PLC did not file monthly operating reports, nor did it pay quarterly fees on its disbursements, although it did pay the United States Trustee the minimum $250 per quarter. PLC's President and CEO made the minimum payments based on financial reports it filed on behalf of the "former reorganized debtor."

### C. Discontent Festers

Within a year after confirmation of the Joint Plan, some of the investors had become skeptical. They had not seen a 35 percent return on their investments. An April 1993 PLC newsletter stated that the return should be adjusted downward to about 15–20 cents on the dollar, with most of the distributions being paid in the later years of the Joint Plan.

On August 13, 1993, a motion was filed on behalf of over 800 disgruntled investors seeking an order requiring PLC to provide a financial "variance report" which would compare the actual results achieved in the liquidation effort to the Joint Plan projections. At a hearing on the motion on September 15, 1993, the bankruptcy court expressed its reluctance to interfere with the "discretion" of the PLC board of directors and further stated that the "Court has no role in directing" the board of directors to provide the requested information. The court expressed its hope that the board of directors would "try to be more forthright" in providing information to the investors, and "recognize that the reorganized debtor's role and ability to

perform is going to be impacted if there's a feeling of—if there's a lack of goodwill." The court then denied the motion with prejudice. Transcript of September 15, 1993 hearing at 81–82.

On May 16, 1997, PLC filed a "Motion to Extend the Tenure of the board of directors and the CEO" until the bank litigation was resolved. The investors vigorously opposed the motion due to their continued frustration with the failure of PLC to provide financial accounting and information regarding the status of the PLC liquidation. *See* Transcript of June 13, 1997 hearing. The court granted the board of directors a six-month extension.

On November 19, 1997, PLC requested an additional extension of the tenure of the current board of directors and CEO. Simultaneously, an investor filed an "Application for the Appointment of an Examiner." The asserted grounds for the appointment of the examiner were the continued failure of the PLC board of directors to cooperate with investors to provide financial accounting, case status information, and information about the anticipated distribution on the investor claims.

The court granted the extension of the board of directors and CEO for one year, but also granted the request for appointment of an examiner. However, the court stayed the appointment of the examiner to give PLC an opportunity to present pleadings regarding its disclosure of financial and other information. The court noted that, even though there "should have been more detail or time spent" on the reporting and accounting aspects at the time of confirmation, there were "techniques and devices" which could still be fashioned to accomplish the dissemination of such information. Transcript of December 18, 1997 hearing at 112.

In its response, PLC conditioned the disclosure of requested information upon the court's agreement (a) not to entertain further motions seeking additional finan-

cial information, and (b) to vacate the order appointing the examiner. On February 13, 1998, the court vacated the stay of the examiner order, holding that "the heavily conditioned offer of certain documents submitted by [PLC] was not sufficient to meet its fiduciary obligations to the investor constituency of this Chapter 11 case and that no showing was made that any particular documents should not be disclosed." [4]

On December 8, 1998, PLC's board of directors and CEO again moved for an extension of their tenure, which the court granted until January 15, 1999, and the court sought the parties' input. PLC made another conditional offer to disclose financial information, which was unsatisfactory to the United States Trustee and the investors.

On December 23, 1998, the United States Trustee filed a "Motion to Convert Case to Chapter 7 Proceeding, or, in the Alternative, to Authorize Appointment of Post–Confirmation Creditors' Committee to Determine Course of Proceeding in Chapter 11 Case." PLC opposed the motion, and, in a newsletter, encouraged over 600 investors to sign a form opposition based on PLC's representation that the appointment of a chapter 7 trustee could result in a leak of confidential information and a dismissal of the bank litigation.

At a continued hearing on the respective motions on January 15, 1999, the court re-examined and reasserted its jurisdiction to fashion a remedy based on its construction of the Joint Plan provisions. The court stated that, although a corporate form was used, PLC was "akin to a liquidating trust," and "it was never contemplated that the new entity exists entirely [independent] from the fiduciary relationship it owes the investors and other creditors." Transcript of January 15, 1999 hearing at 66.

At a continued hearing on February 11, 1999, the court found that PLC was created by the Joint Plan for the purpose of "acting as a liquidating trust," and that "PLC has a fiduciary relationship with the investors" and a "fundamental duty to provide adequate accounting of financial activity." Transcript of February 11, 1999 hearing at 37. The court further found that PLC, which had endured longer than most liquidating trusts, demonstrated unreasonable delay in accomplishing the Joint Plan goals, and in failing to recognize its duty to provide adequate accountings. *Id.* at 38–39. The court observed that a chapter 7 trustee could review and bring closure to the case.

### D. The Conversion Order

Therefore, the court ordered the case to be converted to chapter 7 based on its authority under §§ 1112, 1142 and 105, as well as Article 12 of the Joint Plan. The court extended the tenure of the board of directors and CEO until the chapter 7 trustee determined whether it should continue. Its ruling left to the chapter 7 trustee the questions of whether to continue the prosecution of the bank litigation and the most efficient way to administer the NOLs.

The conversion order was entered on March 1, 1999. The order required "The Consolidated Pioneer Mortgage Entities, including Pioneer Liquidating Corporation (PLC)" to turn over all property and records to the chapter 7 trustee, to file various schedules regarding its post-confirmation debts and obligations, and to file an accounting of its post-confirmation receipts and disbursements. PLC timely appealed the order.

### ISSUES

1. Whether the bankruptcy court erred by finding that PLC owed a fiduciary duty to the investors such that its

---

**4.** An appeal was taken, but was dismissed as being interlocutory, and the matter became moot when the case was subsequently converted to chapter 7.

failure to provide financial accountings was "cause" to convert the chapter 11 case.

2. Whether the bankruptcy court erred by finding "cause" for conversion based on unreasonable delay by PLC that was prejudicial to the investors/creditors.

3. Whether the bankruptcy court erred by determining that conversion was in the best interests of the creditors and the estate.

4. Whether the bankruptcy court had the jurisdiction and authority to require PLC, in the conversion order, to turn over assets under its control to a chapter 7 trustee and to account for its post-confirmation receipts and disbursements.

### STANDARD OF REVIEW

■ A bankruptcy court is given wide discretion to convert a chapter 11 case to chapter 7 for "cause." *In re Greenfield Drive Storage Park*, 207 B.R. 913, 916 (9th Cir. BAP 1997). The decision to convert is reviewed for an abuse of discretion. *In re Klein/Ray Broadcasting*, 100 B.R. 509, 511 (9th Cir. BAP 1987). A bankruptcy court abuses its discretion if it bases its ruling upon an erroneous view of the law or a clearly erroneous assessment of the evidence. *In re Beatty*, 162 B.R. 853, 855 (9th Cir. BAP 1994).

■ The bankruptcy court's interpretation of the confirmed Joint Plan is reviewed *de novo*, as a contract under applicable state law (here, California), and where the court considered the record, testimony or other extrinsic evidence, its interpretation is reviewed for clear error. *See Hillis Motors, Inc. v. Hawaii Auto. Dealers' Ass'n*, 997 F.2d 581, 588 (9th Cir. 1993); *Miller v. Safeco Title Ins. Co.*, 758 F.2d 364, 367 (9th Cir.1985). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v.*

*United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948).

■ The existence of subject matter jurisdiction, as well as statutory interpretation, are legal questions which are reviewed *de novo*. *Greenfield Drive Storage Park*, 207 B.R. at 916; *Reebok Int'l, Ltd. v. Marnatech Enterprises, Inc.*, 970 F.2d 552, 554 (9th Cir.1992).

### DISCUSSION

#### A. Cause Existed for Conversion

■ The bankruptcy court converted this case because it found that PLC demonstrated unreasonable delay in accomplishing the Joint Plan goals, and failed to recognize its duty to provide adequate accountings. A court may convert a chapter 11 case to one under chapter 7 for "cause," including "(3) unreasonable delay by the debtor that is prejudicial to creditors"; ∴ (7) inability to effectuate substantial consummation of a confirmed plan; ... [or] (8) material default by the debtor with respect to a confirmed plan. 11 U.S.C. § 1112(b). The enumerated causes are not exhaustive, and "the court will be able to consider other factors as they arise, and to use its equitable powers to reach an appropriate result in individual cases." H.R. No. 95–595, 95th Cong., 1st Sess. 405–06 (1977), *reprinted in* 1978 U.S.C.C.A.N. 6362. The court must also consider what is in the best interests of the creditors and the estate. 11 U.S.C. § 1112(b).

#### i. PLC Owed a Fiduciary Duty to the Investors

■ The bankruptcy court determined that PLC was acting in a capacity akin to a liquidating trust, and, therefore, it had a fiduciary duty to the investors. The United States Trustee agreed and maintained that PLC was the successor to the reorganized debtor, in addition to being the liquidating entity. PLC argued, however, that the Joint Plan created an independent cor-

poration with no specific fiduciary duties to the investors or the estate, nor any reporting requirements.

 In a typical reorganization, once a plan is confirmed, a reorganized debtor no longer owes a fiduciary duty to the estate because the estate ceases to exist. *In re T.S.P. Industries, Inc.*, 117 B.R. 375, 377 (Bankr.N.D.Ill.1990). If, on the other hand, the plan creates a trust or a vehicle for the exclusive benefit of the creditors, then the trust has a fiduciary duty to those for whose benefit it was created. *See Holywell Corp. v. Smith*, 503 U.S. 47, 53–54, 112 S.Ct. 1021, 1025, 117 L.Ed.2d 196, 204 (1992) (trustee appointed pursuant to chapter 11 plan to liquidate and distribute debtor's property, which had been transferred to a trust, was a fiduciary under the IRC and was required to file tax returns).[5] As an entity created for the investors' benefit, PLC's fiduciary responsibilities included, implicitly, the accountability associated with its origins. *See Werschkull v. United Cal. Bank*, 85 Cal.App.3d 981, 1001, 149 Cal.Rptr. 829, 842 (1978) (under California law, the bank was a fiduciary to the beneficiaries of a pension plan which it administered as trustee).

 PLC argued that there is no express trust language in the Joint Plan. A contract is to be taken by its four corners, construed so as to give effect to every part, and interpreted to be internally consistent. *Brinderson–Newberg Joint Venture v. Pacific Erectors, Inc.*, 971 F.2d 272, 279 (9th Cir.1992), *cert. denied*, 507 U.S. 914, 113 S.Ct. 1267, 122 L.Ed.2d 663 (1993) (applying California law). Although the Joint Plan did not expressly require PLC to provide financial reports to the investors, this alleged deficiency in the provisions did not make the Joint Plan ambiguous as to the nature of PLC's fiduciary duties to the investors.

The Joint Plan defines PLC as a "liquidating corporation," and the record reveals that PLC was formed as a corporation primarily for tax advantages, including the ability of the board of directors to carry over net operating losses. Nevertheless, PLC's duties, responsibilities, and *raison d'etre* were solely the implementation and completion of the liquidation plan, including the prosecution of claims against third parties.

The order confirming the Joint Plan expressly provided that PLC would exercise its powers on behalf of the investors, and hold monies in trust for any non-electing (non-Class 4) investors. The Joint Plan implicitly provided a similar trust arrangement for monies belonging to the electing investors who voted to have their claims treated under Class 4 of the Joint Plan. Their money would be held from proceeds, then distributed when the unrestricted available cash level reached or exceeded $1,000,000.

These are precisely the sort of duties undertaken by liquidating trusts, which are described as follows:

> If a liquidating trust is established, the trust is normally funded with property which will be reduced to cash by the liquidating trustee after confirmation of a plan of reorganization. The liquidating trustee will be given the authority to sell the assets within a reasonable time, to preserve the assets in the interim, and to distribute the proceeds to the debtor's former creditors who are the beneficiaries of the liquidating trust. The plan of reorganization typically will provide that as of the effective date of the plan, all right, title and interest of

---

**5.** We express no opinion on how PLC would be characterized under the Internal Revenue Code, except to note that depending on the facts, an organization can be treated as a trust under the tax regulations, and "[i]n different situations, the IRS has ruled that a liquidating trust should be treated as a taxable trust, a grantor trust, an association taxable as a corporation, or some other taxable entity." John D. Howard, *The Taxation of Liquidating Trusts, Escrows and Settlement Funds in Chapter 11 Bankruptcy Cases*, 64 Am.Bankr. L.J. 403, 413–14 (1990).

the debtor in certain property vests in a liquidating trustee. The trustee's powers are restricted, but often include the power to sell certain property; to increase the fund by avoiding transfers of the debtor's property that are voidable under the Bankruptcy Code; to operate the property; to sue and be sued; to contest and settle disputed claims made against the debtor; to employ attorneys, accountants and agents; and to make distributions pursuant to bankruptcy court orders.

Howard, *supra,* at 404.

■ Moreover, the Joint Plan provisions which required PLC to investigate and/or pursue actions on behalf of the estates of the debtors, and to disburse to creditors and investors their entitlements under the Joint Plan, implicitly entitled the investors to adequate, ongoing, and accurate financial reporting in order to determine whether PLC's board of directors and CEO were fulfilling their duties.

The Joint Plan was not formulated to perpetuate PLC as a for-profit entity, nor to give the PLC board of directors and CEO unfettered control over assets, including payment of their salaries and expenses, which they were entrusted to administer. Rather, their commission was to liquidate PLC's assets, and to consummate the Joint Plan for the benefit of the investors and other creditors.

In addition to its function as a liquidating trust, we agree, on this record and these facts, that PLC was also the successor-in-interest to the reorganized debtor. Since the debtor entities had been dissolved, there was no other entity to succeed to the phantom Debtor's duties post-confirmation, except for PLC. PLC's president and CEO filed operating reports on behalf of the "former reorganized debtor." If PLC were not the successor-in-interest

to the reorganized debtor, an impermissible vacuum of responsibility would exist under the Joint Plan that would be unacceptable under the chapter 11 plan provisions which protected the investors' interests. *See In re Perez,* 30 F.3d 1209, 1213 (9th Cir.1994) (bankruptcy court may only approve a plan that complies with the Code). PLC has acknowledged such status in pleadings filed in this case.[6] PLC succeeded to the Debtor's interest in causes of action against third parties, and to the Debtor's fiduciary duties to prosecute such actions, including the bank litigation, on behalf of the investors. *See In re Williams,* 152 B.R. 123, 128–29 (Bankr. N.D.Tex.1992) (liquidating trustee succeeded to the debtor in possession as a fiduciary to prosecute cause of action on behalf of the bankruptcy estate). We adhere to the fundamental notion that the PLC board of directors and its officers were working for the best interests of their constituency, and not for their own self-interests.

PLC also contends that the bankruptcy court's 1993 order denying the investors' motion for a financial variance report, with prejudice, wherein the bankruptcy court acknowledged the board of directors' discretion in the area of information dissemination, precludes the court's subsequent orders. That order did not forever bar accountings by PLC. It merely dealt with that discrete request at that particular point in time. The "with prejudice" aspect did not provide a perennial safe haven for future irresponsible and arrogant conduct. In fact, the court noted at the hearing on that motion that PLC's failure to provide information willingly might impact its ability to perform the Joint Plan. At such a point, the court would have jurisdiction and authority to step in, pursuant to the Joint Plan provisions. 11 U.S.C. §§ 105,

---

**6.** At least one published opinion in this case has referred to PLC as both the "successor in interest" to the debtor and "the reorganized debtor." *In re Consolidated Pioneer Mortgage,* 178 B.R. 222, 223–24 (9th Cir. BAP 1995),

*aff'd,* 91 F.3d 151 (9th Cir.1996) (PLC was created by plan as the reorganized debtor and one of its duties was to examine proofs of claim).

1142. In addition, subsequent proceedings and orders in which the court asserted authority over PLC arose from later motions requesting other substantive relief, including motions made by PLC itself, *i.e.*, for extension of the board of directors and CEO. PLC looks at the historical record with a myopic eye, and fails to acknowledge the many years of litigation which both preceded and followed that particular order.

Therefore, we hold that to the extent the court reviewed evidence and the record, and the case history, its determination that PLC was a liquidating trust in corporate form was not clearly erroneous.

### ii. Unreasonable Delay and Failure to Account Were "Causes" for Conversion

■■■ Prejudicial delay is cause for conversion under § 1112(b)(3). The court found that PLC's delay in providing adequate financial information to the investors was unreasonable and caused prejudicial delay because the Joint Plan goals were not being met. The record substantiates the finding that PLC's failure to account for and report all disbursements was impeding the administration of the chapter 11 case. The case was converted to preserve the remaining assets for the intended beneficiaries. By converting the case, the court also properly removed the responsibility for implementing the Joint Plan from PLC, whose board of directors and CEO apparently felt that supervision of their activities was an unwarranted imposition upon them.

The record reveals that, through the years, the court was extremely patient with PLC and sensitive to its expressed needs for autonomy and confidentiality. The court denied the investors' first motion for an order requiring production of financial information. Several years later, the investors' continuing dissatisfaction could not be ignored. PLC responded to the court's suggestions by making unreasonable demands upon the court and the other parties, such as requesting that the court refuse to consider any more investor motions of this type. In so doing, PLC displayed only a paramount sense of self-preservation and arrogance, and circled the wagons, rather than extending goodwill and cooperation to those who were the intended beneficiaries of its work. It thus appeared to the court that PLC had lost its focus regarding legitimate requests for information, considering them to be a trespass against its exclusive property interests. Although the court encouraged the parties to discuss reasonable methods of sharing information, the record indicates that PLC simply adopted a "take it or leave it" attitude toward acceptance of its proposal.

■■■ On the issue of undue delay, PLC first contends that subsection (b)(3) is directed to delay in formulating and confirming a reorganization plan. This argument is unpersuasive. The Code does not limit "undue delay" solely to pre-confirmation disputes, and certainly PLC's resistance to providing meaningful information at any stage easily falls within this broad category.

Similarly, PLC also contends that there could be no undue delay where substantial consummation had taken place.[7] PLC's contention that the Joint Plan was substantially consummated is belied by its position that the largest asset, the bank litigation, remains unliquidated. The bankruptcy court did not make a specific finding regarding substantial consummation, but it can be inferred from the evi-

---

7. "Substantial consummation" is defined by the Code as:
 (A) transfer of all or substantially all of the property proposed by the plan to be transferred;
 (B) assumption by the debtor or by the successor to the debtor under the plan of the business or of the management of all or substantially all of the property dealt with by the plan; and
 (C) commencement of distribution under the plan.
11 U.S.C. § 1101(2).

dence that PLC was unable to effectuate substantial consummation of the Joint Plan based on its failure to perform all of its duties on behalf of the investors. PLC did not offer to prove otherwise by producing financial records. Moreover, if the Joint Plan had, in fact, been substantially consummated, PLC should have moved for the entry of a final decree. Fed. R.Bankr.P. 3022. The record reflects that it has never done so. In light of this significant omission, it is difficult to divine how substantial consummation allegedly occurred. On the facts and record, an implicit finding that the plan was not substantially consummated was not clearly erroneous.

The United States Trustee also contends that the delay in providing financial reporting to it and the investors constituted a material default with respect to the Joint Plan. PLC contends that there could not have been a default with respect to the Joint Plan because neither the Joint Plan nor a court order compelled it to provide financial information. A bankruptcy court has discretion to find cause under this subsection when payments have not been made under the confirmed Joint Plan, whether or not the Joint Plan expressly covers the contingency of default within its provisions. *See* 7 COLLIER ON BANKRUPTCY § 1112.04[5] (15th ed.1999). The court's finding of PLC's lack of an accounting for receipts and disbursements, in light of payments to the investors that were significantly less than what PLC estimated, supports cause for conversion based on a material default.[8]

### B. Conversion Was in the Best Interests of the Estate and Creditors

#### i. Post-confirmation Estate Existed

■ The Joint Plan provided that title to the investor interests and all of the

estate assets would vest in PLC automatically upon the effective date of the confirmed plan. PLC contends that, even if cause for conversion exists, there will be no estate to administer once the case is converted, because the confirmed Joint Plan vested all estate property in PLC. This argument raises the question of whether there is an estate to administer post-confirmation, such that conversion would not be in the best interest of the creditors and the estate. Courts are split in their analysis of this issue.

Upon the confirmation of a chapter 11 plan, the effect of confirmation is determined by § 1141(b) & (c):

(b) Except as otherwise provided in the plan or the order confirming the plan, the confirmation of a plan vests all of the property of the estate in the debtor.

(c) Except as provided in subsections (d)(2) and (d)(3) of this section ad except as otherwise provided in the plan or in the order confirming the plan, after confirmation of a plan, the property dealt with by the plan is free and clear of all claims and interests of creditors, equity security holders, and of the general partners in the debtor.

11 U.S.C. § 1141.

Some courts opine that the pre-confirmation estate is available for administration by the chapter 7 trustee, while a growing number of other courts hold that once the property of the estate vests in the debtor (or another entity), by virtue of the automatic vesting provision of § 1141(b)(2) or the plan provisions, then a subsequent conversion does not revest that property in the chapter 7 estate.

Representative of the former view are *In re Calania Corp.*, 188 B.R. 41, 43

**8.** Another cause for dismissal or conversion under § 1112(b) is the nonpayment of any United States Trustee's fees or charges. Both parties argue the merits of PLC's alleged nonreporting of disbursements and nonpayment of a greater amount than the minimum fee as

cause for conversion. However, the bankruptcy court's order did not cite this cause as grounds for conversion. Based on the disposition thus far, and the lack of development of this issue in the record below, the panel declines to reach this issue.

(Bankr.M.D.Fla.1995) and *In re Smith*, 201 B.R. 267, 274 (D.Nev.1996), *aff'd*, 141 F.3d 1179 (9th Cir.1998) (unpublished table decision), *cert. denied*, 525 U.S. 1018, 119 S.Ct. 544, 142 L.Ed.2d 453 (1998).[9] In *Calania*, after a chapter 11 case was converted to chapter 7 for failure to make plan payments, the issue arose as to whether the debtor's post-confirmation mail was property of the chapter 7 estate.

The bankruptcy court examined § 1141(b) in conjunction with other Code sections, including §§ 541, 348 and 1112. Section 541 defines "property of the estate" as "all legal or equitable interests of the debtor in property *as of the commencement of the case.*" § 541(a) (emphasis added). Section 348 contains the provisions regarding the effect of conversion. It states that the conversion does not effect a change in the date of the commencement of the case. No new estate is created upon the conversion of a case from one chapter to another, thus the property of the estate is "fixed as of the date of the original filing." *See id.* at 42–43. Section 1112(b) provides for the conversion of a chapter 11 case to chapter 7 for "cause" post-confirmation. 11 U.S.C. § 1112(b)(7)–(9).

The bankruptcy court concluded as follows:

> A careful analysis of the Code provisions permits only one conclusion that properties which were subject to the confirmed plan that is properties in which the Debtor had a cognizable legal or equitable ownership interest on the date of confirmation will be properties of the estate in a Chapter 7 case, but properties which are clearly acquired by the Debtor post-confirmation will not be subject to administration by the Chapter 7 trustee.

188 B.R. at 43.

In *Smith*, the District Court held that the bankruptcy court properly converted a debtor's chapter 11 case to chapter 7, even though the plan had already been confirmed, because the debtor had not complied with the plan provisions that would have allowed the creditors to be paid pursuant to the plan.

The District Court rejected the debtor's argument that plan confirmation precluded conversion because confirmation vested the estate's property in the debtor, and reasoned that to hold otherwise would render the Code provisions for conversion or for altering the vesting provision § 1141(b) meaningless. *Smith* followed the reasoning of *Calania*, where the court concluded that it would be "utterly pointless" for Congress to create the provisions of § 1112(b)(7–9) if § 1141(b) meant there would be no assets to administer. *Calania*, 188 B.R. at 43.

The plan in *Smith* also provided that the bankruptcy court would retain jurisdiction to enforce the plan and for other purposes. *Smith*, 201 B.R. at 274. The District Court held that the bankruptcy court had jurisdiction over the property, and that the creditors, who would have been paid except for the debtor's nonperformance under the plan, must not be left entirely without a remedy. *Id.*

The facts in *Smith* are similar, and its rationale persuasive in the instant case. Like *Smith*, the Joint Plan actually, if not expressly, limited vesting in the estate by making the assets and/or proceeds subject to the interests of the investors. The Joint Plan also provided for the broad retention of bankruptcy court jurisdiction over the continuing enforcement of the Joint Plan.

PLC's contrary authority, however, provides counter-argument. Representative of this line of cases are *T.S.P. Industries,*

---

**9.** Other cases espousing this view include: *In re Midway, Inc.,* 166 B.R. 585, 589–91 (Bankr. D.N.J.1994); *In re NTG Industries, Inc.,* 118 B.R. 606, 610 (Bankr.N.D.Ill.1990). *See also In re D & D Furniture, Inc.,* 239 B.R. 54, 57 (Bankr.E.D.Pa.1999) (citing authorities).

*supra* and *In re K & M Printing, Inc.*, 210 B.R. 583, 584 (Bankr.D.Ariz.1997).[10]

In *T.S.P. Industries*, the United States Trustee moved to convert a post-confirmation chapter 11 case in order to investigate whether there were any assets subject to liquidation. The bankruptcy court found that dismissal instead of conversion was in the best interest of the creditors because a chapter 7 trustee would not have authority to liquidate assets that now belonged to the debtor. *Id.*, 117 B.R. at 376.

The United States Trustee argued that determining that there would be no chapter 7 estate would render § 1112(b) a nullity. The court found, however, that §§ 1141(b) and 1112 were not in conflict because conversion might be in the best interest of the creditors if the plan provided for conversion and the retention of jurisdiction over the property in the event of default. *Id.* at 379. In addition, the court determined that this result comported with the absence in the Code of a provision to reinstate the automatic stay, rendering a chapter 7 trustee and the provisions for revocation of the plan "rather toothless." *Id.* at 378–79.

Nevertheless, the court stated that conversion might be in the best interest of the creditors "when there is a preference or a fraudulent conveyance that occurred before the commencement of the chapter 11 proceeding and the debtor currently has no significant assets. In that situation the power to avoid the questionable transaction would be lost if the case were dismissed." *Id.*

In *K & M Printing*, the bankruptcy court was asked to determine which assets belonged to the chapter 7 estate after a post-confirmation conversion. Following the "better" reasoning of *T.S.P. Industries*, the bankruptcy court determined

there were no assets and dismissed the case, further noting the tension between the distribution scheme of § 726 and the binding provisions of the confirmed plan. "If section 726 is chosen, this has the effect of revoking confirmation without the limitations placed on the revocation power by section 1144." *Id.* at 585. The court stated that conversion would only be in the creditors' best interest under the following circumstances:

> However, if the plan or confirmation order expressly provides for revesting upon conversion, or particular circumstances justify conversion (e.g., avoidable prepetition transfers exist), then conversion can be in the creditors' best interest.

*Id.* at 585–86.

The Ninth Circuit has not discussed this particular controversy or these cases. However, in a 1992 opinion, the Court of Appeals addressed the issue of what constitutes chapter 7 estate property in a converted post-confirmation chapter 11 case. *Hillis Motors*, 997 F.2d at 587–90.

*Hillis Motors* held that the "reversion of property from the estate to the debtor upon confirmation … is explicitly subject to the provisions of the plan." *Id.* at 587. The plan in *Hillis Motors* did not state in unambiguous terms that the property of the estate did not revest in the debtor. However, it "unambiguously provide[d] for the continuation of the estate postconfirmation" because the plan: (1) mandated the payment of a percentage of the debtor's post-confirmation profits into the estate for later distribution; (2) protected the estate from certain post-confirmation claims; and (3) the bankruptcy court treated and allowed certain post-confirmation

---

10. Other cases include: *In re Troutman Enterprises, Inc.*, 244 B.R. 761, 766 (Bankr. S.D.Ohio 2000) (agreeing that Congress intended that conversion alone does not recapture property which vests in the debtor); *D & D Furniture*, 239 B.R. at 59 (stating *in dicta* that post-confirmation conversion might not be justified when the only assets are those which would normally revest in the debtor, and citing authorities); *In re BNW, Inc.*, 201 B.R. 838, 849 (Bankr.S.D.Ala.1996); *In re Winom Tool & Die, Inc.*, 173 B.R. 613, 621 (Bankr.E.D.Mich.1994); *In re H.R.P. Auto Center, Inc.*, 130 B.R. 247, 256–57 (Bankr. N.D.Ohio 1991).

claims as administrative expenses. *Id.* at 588–89.

In determining that the automatic stay was still in effect, the Court of Appeals noted that the plan provided for a "future" discharge of the debtor. In addition, the trustee was retained to manage and control the business, subject to the bankruptcy court's jurisdiction. "Hillis was not free to do what it pleased with its assets and property but rather the distribution of the company's profits was strictly controlled." *Id.* at 589.

In the instant case, the Joint Plan contained explicit provisions for the distribution of liquidation proceeds to the investors, its primary beneficiaries. The Joint Plan created a corporate liquidating entity, PLC, but left the bankruptcy court heavily involved in the selection of management and shareholders of that entity if the liquidation was not completed within five years after confirmation.[11] The bankruptcy court retained broad powers over both Joint Plan implementation and interpretation in the event of disputes, including controversies involving the board of directors. Notwithstanding the transfer of assets to PLC, the transfer was not "free and clear" of the investors' interests or the bankruptcy court's supervision.

Another factor in favor of the bankruptcy court's action in this case is the nature of the assets yet to be administered, i.e., the bank litigation and, possibly, the malpractice action initiated by PLC.[12] Even

the cases which support PLC's position recognize that any remaining causes of action would be property of a chapter 7 estate. *See Troutman Enterprises,* 244 B.R. at 765 (only non-administered assets such as possible causes of action may remain); *D & D Furniture, Inc.,* 239 B.R. at 58; *T.S.P. Industries,* 117 B.R. at 379; *H.R.P. Auto Center,* 130 B.R. at 257. *See also Greenfield Drive Storage Park,* 207 B.R. at 917–18, where the. Ninth Circuit BAP affirmed an order converting a post-confirmation chapter 11 case to chapter 7 in which the significant asset had been foreclosed upon and there was no revenue, but where "unresolved matters concerning the estate remain[ed] to be decided."

Finally, the panel is concerned that PLC's refusal to provide a financial accounting of its receipts and disbursements over several years of this pending case may be, in effect, a concealment of assets. In one case where assets were concealed, the bankruptcy court held that the default rule established by § 1141(b)—that property of the estate vests in the reorganized debtor upon confirmation of a plan of reorganization—does not apply. *Troutman Enterprises,* 244 B.R. at 768.

Applying the rationale of *Hillis Motors* to the unambiguous plan in this case, and based on the foregoing analysis, the panel holds that there would be an estate for the chapter 7 trustee to administer consisting of the assets held by PLC for the benefit

---

**11.** The plan provided that PLC would have a seven member board of directors who would also be the sole shareholders of PLC. No director could serve more than five years without the permission of the bankruptcy court. Joint Plan, Art. 5.3. If a director ceased to serve in that capacity, the director effectively ceased to be a shareholder. Joint Plan, Art. 5.2. The plan is silent with respect to what would occur if the bankruptcy court declined to grant permission to any of the directors to extend their term as members of the board of directors.

**12.** PLC contends that the malpractice action is "personal" to it, and was not a part of the pre-confirmation bankruptcy estate. Opening

Brief at 30. However, the same case law would suggest that such claims against professionals for their conduct during the case, in which the recovered funds would be part of the assets for distribution to the investors, would be property of the chapter 7 estate. *See D & D Furniture,* 239 B.R. at 58; *see also In re Atlantic Computer Systems, Inc.,* 163 B.R. 704, 706 (Bankr.S.D.N.Y.1994) (discussing "related to" jurisdiction of the bankruptcy court over an action that affected the debtor's estate, *i.e.,* recovery of funds for the benefit of the estate, versus funds collected by a debtor that would not be turned over to the chapter 7 trustee).

of the creditors and investors.[13]

We additionally hold that the bankruptcy court had the necessary jurisdiction to convert the case to preserve the assets for the unpaid classes of creditors. 28 U.S.C. § 1334(b); 28 U.S.C. § 157(b)(1)(2).

### ii. The NOLs and Possible Loss of Confidentiality as Further Arguments against Conversion

PLC argues that there are other reasons not to convert, for example, the possible loss of the NOLs and of confidentiality, which could, presumably, jeopardize the bank litigation.

 A debtor's right to carry forward or carry back an NOL is a tax attribute of the debtor that is part of the bankruptcy estate, pursuant to the Internal Revenue Code § 1398(g)(1). *In re Feiler,* 230 B.R. 164, 168 (9th Cir. BAP 1999). This property interest would normally pass to the chapter 7 trustee. 11 U.S.C. § 541(a). PLC contends that since it, not the Debtor, owns the NOL entitlements, the board of directors must remain intact because the NOL is a potential benefit to the investors and creditors only to the extent that future taxable income can be offset against it. Thus, PLC contends that a $31 million NOL would not pass to the chapter 7 estate. The bankruptcy court left the continuation of the board of directors' tenure open for investigation and recommendation by the chapter 7 trustee. As the final decision on that issue was postponed, we hold that the issue of the NOLs is premature and is not before us.

 PLC maintains that the disclosure of its financial information and the access to such information by the defendants in the bank litigation will put PLC's litigation strategy and posture at great risk. PLC also argued that, as the alleged remaining major asset, the court's order for such disclosure was not in the best interests of the investors. These arguments are without merit. There are several reasonable ways to protect the confidentiality of PLC's financial information, as pointed out by the United States Trustee and the court, with which the panel agrees. PLC's refusal to consider these alternatives, and its insistence on dictated terms, were unreasonable and a clear breach of its duties to the PLC creditors/investors.

The bankruptcy court correctly determined that PLC's expressed reasons for nondisclosure were frivolous. Sitting as a court of equity, the bankruptcy court appropriately exercised its duty to protect the estate property for the benefit of the creditors in a manner consistent with the Bankruptcy Code. *See In re Cooper Properties Liquidating Trust, Inc.,* 61 B.R. 531, 537 (Bankr.W.D.Tenn.1986); § 105.

### C. The Bankruptcy Court Did Not Exceed its Authority by Ordering PLC to Make an Accounting and Turn Over Assets to the Chapter 7 Trustee

 PLC raises a jurisdictional issue and alleges that the bankruptcy court improperly treated PLC as if it were the debtor in the converted chapter 7 case. Consequently, PLC contends that the bankruptcy court exceeded its jurisdiction and/or authority by ordering PLC to disclose information regarding its assets or to turn its assets over to a chapter 7 trustee.

Notwithstanding PLC's obfuscation, that is not what occurred in this case. Although the bankruptcy court included in the conversion order a provision requiring that all of the Debtor entities, including PLC, turn over to the chapter 7 trustee all

---

**13.** PLC also argues that the chapter 7 trustee will not have standing to pursue the litigation. However, we have held that PLC is the successor to the reorganized debtor. In turn, the chapter 7 trustee will succeed to the estate's interest in the third-party claims. In addition, the bankruptcy court did not terminate PLC, but left it up to the chapter 7 trustee to determine if PLC was necessary to the continuation of the bank litigation. Clearly, a chapter 7 trustee has the power to administer property of an estate, including the prosecution of existing litigation. 11 U.S.C. § 704; Fed.R.Bankr.P. 6009.

of their "records and property of the estate under its custody and control," Order Converting Case to Chapter 7, para. 3.a., that does not mean that the bankruptcy court made PLC a chapter 7 debtor. The court converted the cases of Consolidated Pioneer Mortgage Entities, which are the consolidated debtors.

The Joint Plan expressly provided that the bankruptcy court would retain jurisdiction over all disputes arising in connection with the Joint Plan, including the actions of the board of directors and the shareholders of PLC. *See Hillis Motors,* 997 F.2d at 589. In addition, the court had core jurisdiction over the liquidation and disbursement of the estate assets pursuant to the Joint Plan, and the general administration of the estate. 28 U.S.C. §§ 157(b)(1), 1334(b).

The bankruptcy court clearly had jurisdiction to order an accounting by PLC during the pendency of the plan's implementation. Furthermore, the Code gives the bankruptcy court authority to "direct the debtor and any other necessary party" to perform any act necessary to consummate the plan, and "to issue any order, process or judgment that is necessary or appropriate to carry out the provisions" of the Code. 11 U.S.C. §§ 105(a), 1142(b). The bankruptcy court's authority under § 1142(b) extends to post-confirmation activities necessary to complete performance under the plan and close the case. The bankruptcy court believed that the chapter 7 trustee could better fulfill the plan goals regarding the unadministered assets. *See NTG Industries,* 118 B.R. at 611 (chapter 7 trustee can complete the administration of preference actions initiated by the chapter 11 committee; citing *Goodman v. Phillip R. Curtis Enterprises, Inc.,* 809 F.2d 228 (4th Cir.1987) and *In re Johns–Manville Corp.,* 97 B.R. 174 (Bankr.S.D.N.Y. 1989)(a court's authority under § 1142(b) extends to post-confirmation matters concerning implementation or execution of the plan)).

The conversion order required PLC to comply with Fed.R.Bankr.P. 1019(4) and (5). That rule provides that "the debtor in possession" or the "trustee" serving at the time of conversion shall timely turn over records and property of the estate, and file various schedules. The rule is intended to apply to the person or entity who was previously in charge of the estate in the superceded case. NORTON BANKRUPTCY LAW AND PRACTICE 2D, Editor's Comment, at 67–68 (1999–2000 ed.). Rule 1019 is derived from former Bankruptcy Rule 122, which referred to "any trustee, receiver, or debtor in possession previously acting in the chapter case." 9 COLLIER ON BANKRUPTCY § 1019.RH (15th ed.1999). It would be illogical to exclude PLC, who was the only entity in charge of the estate assets, from contributing this required information.

In summary, while recognizing that the Joint Plan contemplated a different legal form to accomplish the similar goals of a liquidating trust, the court nevertheless asserted jurisdiction over PLC in order to accomplish the Joint Plan's intended results. PLC was not the debtor, but it succeeded to the reorganized debtor's assets and liabilities. It became the owner of property that was held in trust for the benefit of creditors of the estate. Conversion of the case was possible because assets still remained to be administered. The bankruptcy court properly asserted its express, equitable, and inherent authority over PLC and the remaining estate property in order to square the unanticipated results of PLC's intransigence with the Code and Joint Plan provisions. 11 U.S.C. § 1142 and 105(a). We find no legal inconsistency in its having done so.

## CONCLUSION

The bankruptcy court did not err by finding that PLC owed a duty to the investors to provide appropriate financial information. The court did not err by finding cause to convert the post-confirmation chapter 11 case to chapter 7 based on PLC's dereliction of these duties, and in finding that its failure caused undue delay

in completion of the reorganization plan. The court did not abuse its discretion nor err by determining that conversion was in the best interests of the estate. By requiring PLC to turn over assets and records, and to file required schedules, the court did not exceed its jurisdiction or authority. The Order Converting the case is AFFIRMED.

PERRIS, Bankruptcy Judge, concurring.

Although I agree with the majority's conclusion that the bankruptcy judge did not abuse his discretion when he converted the case, I write separately because I do not think that reaching this conclusion requires resolution of some of the issues discussed by the majority.[14]

As the majority points out, the bankruptcy court may convert a chapter 11 case to chapter 7 "for cause." The facts in this case provided an ample basis upon which the court could find "cause" to convert. More than six years had elapsed between confirmation and the time the bankruptcy court decided the motion to convert. The plan of reorganization created a corporate liquidating entity, PLC, but left the bankruptcy court heavily involved in the selection of management and shareholders of that entity if the liquidation was not completed within five years after confirmation. The court had given permission for the board of directors members to serve four extensions and was facing a request for a further extension. PLC had continuously resisted providing financial information to investors and the United States Trustee regarding the liquidation, notwithstanding the fact that the investors were to be the beneficiaries of the liquidation and thus far the liquidation had produced a far smaller distribution than had been projected in correspondence soliciting votes on the plan.

PLC's argument that the plan did not impose on it a duty to provide financial information to interested parties and that it did not have a fiduciary duty to investors and creditors misses the mark. The PLC directors had sought permission to extend their service. The court wanted to hear from interested parties regarding the request. The interested parties had a legitimate interest in being provided financial information so they could present meaningful arguments and evidence to the court on the requested extension. PLC was refusing to provide the information.

Under the circumstances, converting the case to chapter 7 so a neutral chapter 7 trustee could investigate why the liquidation had produced substantially less for investors than projected and could make a neutral and informed recommendation to the court regarding the request of the PLC directors for permission to continue to serve was not an abuse of discretion.[15] I agree with the majority's rejection of PLC's argument that conversion is not in the best interests of the creditors, investors and the estate.

14. In particular, I do not think that it is necessary to decide whether assets that have ceased to be property of a bankruptcy estate by virtue of confirmation of a chapter 11 plan once again become property of the estate upon conversion, whether PLC was a liquidating trust in corporate form, and whether the court had authority to order PLC to turn over assets to the chapter 7 trustee. The latter issue was never raised as an issue on appeal and, regardless of the conclusion reached on the other issues, there was ample cause for conversion.

15. The bankruptcy court order extended the term of the PLC directors. This was a better result for all concerned than the possible alternative of both denying the motion to convert and denying permission to all the directors to extend their term. That potentially would have resulted in a liquidating entity with no directors or shareholders, because the confirmed plan prohibits a director from serving more than five years without court permission and provides that once a person ceases to serve as a director the person also effectively ceases to be a shareholder. There are no shareholders other than the directors. Plan, Articles 5.2 and 5.3.