**In re Nesbit Lee LACY, a/k/a N. Lee Lacy, Debtor.**

**No. 00–23048–SBB.**

United States Bankruptcy Court, D. Colorado.

Aug. 21, 2003.

Lee M. Kutner, Esq., Kutner, Miller, Kearns, P.C., Denver, CO, Robert Ungar, O'Laverty & Ungar, Montecito, CA, for Nesbit Lee Lacy.

Gregory L. Williams, Esq., Block, Markus, Williams, LLC, Denver, CO, Lawrence C. Hinkle, II, Los Angeles, CA, for Stinky Love, Inc.

## MEMORANDUM OPINION AND ORDER

SIDNEY B. BROOKS, Chief Judge.

THIS MATTER comes before the Court on the Motion to Convert Case to Chapter 7 Liquidation ("Motion to Convert") (Dock-

et No. 237) filed on March 4, 2003 by Stinky Love, Inc. ("SLI") and the Objection thereto (Docket No. 242) filed on March 27, 2003 by Nesbit Lee Lacy ("Debtor"). The Court, having reviewed the file and conducted an evidentiary hearing on June 4, 2003, and being otherwise advised in the premises, makes the following findings of fact, conclusions of law and order.

Based upon the reasons set forth below, this Court concludes that it is appropriate and necessary to convert the within bankruptcy case from Chapter 11 of the Bankruptcy Code to Chapter 7 of the Bankruptcy Code. Thus, SLI's Motion to Convert (Docket No. 237) shall be GRANTED.

## I. INTRODUCTION

The pending Motion to Convert cannot be adequately dealt with in isolation. It must be viewed in the greater context of the events leading up to bankruptcy, during bankruptcy and after confirmation of Debtor's First Amended Plan of Reorganization ("Plan"). This Court has presided over this bankruptcy case during a period of almost three years. Indeed, this case has had a long and tortured history.

The record before this Court, established by the numerous pleadings filed and the hearings held prior to confirmation and post-confirmation, chronicles a two-party war. That is, the Debtor, on the one hand, and the creditor, SLI, on the other. While others have been affected by this battle—most notably, Preferred Bank and D & A Mortgage, two creditors on certain commercial rental property owed by the Debtor located on Melrose Drive in Los Angeles—from beginning to end, the two *real* players in this case are SLI and Debtor.

The Court also has concluded, over time, that this proceeding—filed here in Colorado by an individual who evidently resides in California and whose assets are primarily located in California [1] and who has been involved in bitter and extended litigation in California with California-based SLI—was filed primarily as a tool to continue litigation with SLI, then long pending in California, but in a venue and under circumstances more advantageous to the Debtor and less amenable to SLI. The events and machinations leading to the present Motion to Convert illustrate that the Debtor is nimble at procedural and transactional gymnastics, but improperly manipulative of the bankruptcy system and abusive toward his principal creditor/adversary, SLI.

Moreover, in adjudicating the Motion to Convert, the Court finds that SLI presented reliable, relevant and sufficient evidence in support of its stance. However, the quality and quantity of evidence presented—or, more accurately, *not* presented—by the Debtor with respect to: (1) the accuracy of representations in the Plan and the Third Amended Disclosure Statement ("Disclosure Statement"),[2] (2) the representations made in the Debtor's Chapter 11 Final Report and Application for Final Decree, and (3) ostensible compliance with the Plan, as raised in the defense of the Motion to Convert, leads this Court to the inevitable conclusion that rep-

---

**1.** The Debtor owns (owned) a home in Aspen, Colorado and that is the basis for venue in this Court under 28 U.S.C. § 1480. His original schedules state that his address was 4700 East Highway 82, Aspen, CO 81612. However, the mailing address of the Debtor was listed as P.O. Box 8047, Aspen, CO 81612 and 8446 Melrose Place, Los Angeles, CA 90069.

It appears that during the course of the Debtor's case, his Aspen P.O. Box has been used for service upon the Debtor personally.

**2.** The Third Amended Disclosure Statement accompanied the First Amended Plan and was approved by the Court on August 10, 2001.

resentations made by this Debtor in his Plan, Disclosure Statement, Chapter 11 Final Report and Application for Final Decree are poor, at best, and at worst, misleading or fraudulent.

The foregoing serves as a foundation for the specific findings below.

## II. THE HISTORY LEADING TO THE BANKRUPTCY CASE

### A. *The IAC/SLI Contract and the Box Office Failure of "Love Stinks"* [3]

In 1997, Debtor made investments and loans to a venture which became Independent Artists Company, LLC ("IAC"). In early 1999, IAC began operations and shortly thereafter other ventures ("IAC ventures") were formed and also began operations. Over time, Debtor made investments in the various IAC ventures to facilitate their operations and additional capital was sought in order for them to fully implement their various plans of operations. One of these plans of operations involved the marketing of a movie entitled "Love Stinks." SLI was a corporation formed by the producers of that movie.

Since IAC was the first of the companies to become operational, and time was of the essence, IAC assumed the worldwide distribution and licensing rights to the movie "Love Stinks." IAC later assigned the domestic distribution responsibilities to Independent Artists Domestic Distribution, LLC ("IADD"). Initially it was agreed that the film "Love Stinks" should have a marketing budget of $5,000,000.00. Debtor agreed to lend to IAC the $5,000,000.00 in the event that it could not raise these funds from outside sources within a certain time-frame.

It became apparent that IAC was not going to be able to raise the $5,000,000.00. Debtor then borrowed monies obtained by pledging as security certain personal assets. He then lent the funds he had borrowed to IAC so IAC could provide the monies needed to domestically distribute the film and attempt to fulfill its contractual obligations for worldwide rights with SLI.

In the months to follow, SLI, along with a Mr. David Sheldon, IAC's Vice President of Business Affairs ("Mr.Sheldon"), and IADD agreed to an expenditure of $8,000,000.00, instead of the $5,000,000.00 for the marketing of "Love Stinks." Debtor advised that IAC would not be able to advance more than the $5,000,000.00 already committed. In order to commit to an additional $3,000,000.00, it would be necessary to borrow funds from another source. Mr. Sheldon arranged for a loan from the Lewis Horowitz Organization ("LHO"), which required the assignment of all IAC rights in the film to a newly-formed single purpose entity called Love Stinks Distribution, and the pledging, in first position, of all the film's revenue streams, after deducting fees and costs, until the full repayment of the LHO loan. As a consequence of the new arrangement with LHO, IAC and SLI entered into a revised contract restructuring the terms of the initial contract in order to allow for the LHO loan to go forward.

The movie "Love Stinks" failed in the box office. The film failed to generate even worst-case statistical projections for revenue based upon the marketing and distribution plan. Obviously, the failure of

---

**3.** The information set forth herein is based upon (1)various pleadings filed with the Court, in particular, the Debtor's Disclosure Statement, (2) representations made to the Court during these proceedings, and (3) a review of the materials in the California litigation. This historical background does not appear to be disputed by the parties.

the film had a negative effect on the financial circumstance of IAC and Debtor. Because domestic revenue paled in comparison to the expenditures and because the first rights to revenue balances from the film were pledged to LHO, IAC became unable to service its debts in a timely fashion. This caused IAC to have cash flow difficulties, which then led to IAC's (1) inability to service or repay Debtor for his loans, (2) failure to pay Debtor's salary, and (3) failure to pay rent on leased office space at certain commercial property owned by the Debtor located on Melrose Drive in Los Angeles, California ("The Melrose Place Property").

**B. The Resultant Litigation from the Box Office Failure of "Love Stinks"**

Without income and cash flow, the Debtor was unable to continue to make payments on his debts causing a default with Preferred Bank on the Melrose Place Property. This led to Preferred Bank seeking the appointment of a receiver in connection with a foreclosure of the Melrose Place Property. Debtor filed the bankruptcy primarily to deal with a lawsuit brought against him and others by SLI in the Superior Court in the State of California, County of Los Angeles, as Case No. BC223980 ("California Litigation") and yet still retain control of his extensive real estate holdings, including, but not limited to, the Melrose Place Property.

The California Litigation generally involved claims arising from or related to the aforementioned contract between SLI and IAC for the distribution of "Love Stinks." In addition, SLI sought a determination that (1) Debtor was personally responsible for IAC's liability for contract damages under an alter ego theory (that is, it was alleged that Debtor was the alter ego of IAC), (2) Debtor, in his individual capacity, fraudulently induced SLI to enter into a contract with IAC, and (3) Debtor, in his individual capacity, made negligent misrepresentations with respect to the contract.

In accordance with the terms of the contract, the claims between SLI and IAC were submitted to binding arbitration. On December 28, 2000, the arbitrator entered an amended arbitration award in favor of SLI as to SLI's breach of contract claim and against SLI on its claim that IAC fraudulently induced SLI to enter into the contract. The arbitrator entered a determination that IAC's liability for the damages arising from the breach of contract claim amount to approximately $5,000,000.00.

The Debtor in the California Litigation filed a demurrer as to all three of the claims. California recognizes a demurrer as, essentially, an affirmative defense akin to Rule 12(b)(6)—failure to state a claim upon which relief can be granted. As to its claims against Debtor, the California Court sustained the Debtor's demurrer as to the claim for fraud and negligent misrepresentation without granting SLI leave to amend the claims. All that remained at the time of the filing of the bankruptcy case was the alter ego claim.

**III. KEY EVENTS IN THE BANKRUPTCY CASE**

The Debtor filed for relief under Chapter 11 of the Bankruptcy Code on November 1, 2000. Debtor's original schedules reflected that he was no pauper, listing $38,627,893.81 in assets[4] and $7,966,978.14

---

4. In Schedule A, Debtor listed $15,550,000.00 in real property. In Schedule B, Debtor listed $23,077,893.81 in personal property.

in liabilities.[5] Thus, Debtor's estate had net equity of $30,660,915.67. The schedules indicated that all creditors—including SLI—could be paid 100% in this case. His scheduled assets included, among others:

(1) 12 acres of unimproved land in Brentwood, California (the "Sullivan Canyon Property") valued in his schedules at $7,400,000.00 with a secured claim thereon of $1,500,000.00.[6]

(2) Real estate located at 1240 Sierra Alta Way, Los Angeles, California with a value listed in his schedules at $1,650,000.00 with a secured claim thereon of $1,279,000.00.

(3) The Melrose Place Property valued at $6,5000,000.00 with secured claims thereon of $4,100,000.00.

(4) Art valued at almost two-million dollars.

(5) Personal wardrobe valued at $10,000.00.

(6) Jewelry valued at $13,000.00.

(7) Nikon and Hasselblad cameras and lenses and accessories valued at $18,000.00.

(8) Stocks and interests in businesses valued at $8,500,000.00.[7]

(9) Accounts receivable valued at $12,122,842.00.

(10) Vehicles valued at $112,710.00

At the time the bankruptcy petition was filed and at confirmation, SLI's claims had not been liquidated and were disputed, still in litigation in California. During the case, on April 3, 2001, the Court granted SLI relief from the automatic stay in order to litigate its alter ego claim to a final conclusion the California Litigation. However, the Court continued the stay as to the enforcement of any judgment adverse to Debtor without further order of this Court. SLI proceeded with the litigation of its claim in California and obtained a judgment against the Debtor, personally, in the amount of approximately five million dollars. The Debtor timely filed an appeal with respect to the judgment. Evidently, no bond was posted nor was any stay entered in conjunction with the appeal.

The Plan was confirmed by the Court on September 17, 2001 (also referred to herein as the "Effective Date"). On June 26, 2002, based upon representations by the Debtor in his Chapter 11 Final Report and Application for Final Decree, filed on March 22, 2002, this Court entered a Final Decree in this case.

The Debtor's confirmed Plan required him to liquidate sufficient assets to pay his creditors in full. After the entry of the Final Decree, SLI became concerned with respect to the Debtor's post-confirmation activities. In particular, SLI became aware of payments to the Debtor, himself, his companies, his friends and associates and other modest unsecured creditors. However, SLI was left out of the payment scheme entirely. As a result, SLI request-

---

5. Debtor listed a total of $6,894,619.40 in secured claims and $1,072,358.74 in unsecured claims.

6. The Sullivan Canyon is an area outside of Los Angeles which has been described by various parties in this case as an Eden-like oasis in a city. The area is mountainous and isolated from the traffic and noise of the city. It is known for its small ranches and its famed residents, including the likes of film icon, Steven Spielberg.

7. Including the Tagert Lakes Holdings, LLC and Tagert Lakes Nursery & Landscaping, Inc., which own the Tagert Lakes Ranch, see infra IV(B)(1). The Tagert Lakes Ranch is property located just south of Aspen, Colorado on Hwy. 84. The property is unique in that it is one of the few remaining pieces of property of any significant size in the Aspen area.

ed that the Debtor provide information regarding various transactions contemplated under the Plan and his compliance with and performance under the confirmed Chapter 11 Plan of Reorganization. The Debtor declined to comply with those requests.

SLI then filed a Motion to Reopen the bankruptcy case pursuant to 11 U.S.C. § 350 and to conduct an examination of the debtor pursuant to Fed.R.Bankr.P.2004. After a hearing on the Motion to Reopen and SLI's deposition of the Debtor, this Court granted same.

Following the reopening of this case, SLI moved to convert this case to a case under Chapter 7 pursuant to 11 U.S.C. § 1112(b). Specifically, as more fully discussed in section V(B) *infra*, SLI seeks relief under 11 U.S.C. § 1112(b)(2), (3), (7) and (8). In support of its Motion, SLI contends that the Debtor has: (1) completely disregarded his duties under the confirmed Chapter 11 Plan of Reorganization and (2) dissipated his assets to the point that SLI may not receive payment of its claim in full or substantial measure. SLI argues that permitting the Debtor to continue forward will only relegate SLI's claim to further interminable litigation stemming from Debtor's failure to perform under and comply with his Plan.

The Debtor opposes the Motion to Convert for essentially two reasons. First, Debtor denies that he has breached his duties under the Plan. Second, Debtor contends that the effect of the confirmation of his Plan is that (a) all property vested in the Debtor on confirmation and there is no estate at this point, (b) the Court has no jurisdiction to deal with the issues raised by SLI, and (c) his creditors, including SLI, must instead resort to state court proceedings to protect and enforce their rights under the confirmed Plan.

At the hearing on June 4, 2003 on the Motion to Convert, SLI presented testimony from Lawrence Hinkle and exhibits were offered and introduced.[8] Debtor did not appear at the hearing, nor did his attorneys present any exhibits.[9]

## IV. THE FACTS AT THE HEART OF THIS DISPUTE

### A. *The Debtor's Plan and Disclosure Statement*

The Debtor's Plan was confirmed based on the representations and disclosures contained therein and in the Disclosure Statement. In addition to fully-secured mortgagees, the Disclosure Statement indicated that there were a total of $6,073.351.00[10] in

---

8. For the purposes of clarifying the record on appeal, SLI's Exhibits 1–3, 8, 19, 33, 40–43 were offered and admitted with no objection being raised by the Debtor. SLI's Exhibits 4–7, 9–18, 20–22, 23–32, 34–37, and 39 were offered and admitted over objection as stated on the record in open court. The Court reserved ruling on SLI's Exhibit 44. By this Memorandum Opinion and Order, and having reviewed the objection once again, this Court hereby admits the same into evidence. SLI's Exhibit 38 was offered and was not admitted after objection as stated on the record in open court. At the close of the hearing the original exhibits were returned to counsel to retain pending any appeal in this matter.

9. Also present at the hearing was Jeff Franklin, a principal of SLI. A Mr. Kenneth Lau, an attorney for Fotokem Industries, Inc. ("Fotokem") requested to appear by telephone so as to be hearing regarding Fotokem's "Comments" with respect to SLI's Motion to Convert. Because Mr. Lau was not licensed before the District Court of Colorado and because the request to appear by telephone was untimely, the Court denied his request to be heard, but did allow Mr. Lau to remain on the telephone during the hearing.

10. This sum varies from the total listed in the original schedules because of the addition of SLI's claim of $5,000,000.00 and the $9,000.00 claim of R. David Smith, P.C. and

unsecured claims against the estate. Of this total, $1,065,351.10 [11] was listed as unsecured claims not disputed or contingent. The Debtor listed SLI's claim of $5,000,000.00 and the $9,000.00 claim of R. David Smith, P.C. as disputed and/or contingent. The Debtor, by way of his Plan, Disclosure Statement and other representations to the Court, indicated that the unsecured claims would be paid in full. Unsecured claims in excess of $1,000.00 were to be paid within two years of confirmation, with 8% interest. Under paragraph 9.3 of the Plan, when making distributions to unsecured creditors, the Debtor was required to reserve in an interest-bearing account a *pro rata* amount for any disputed claim pending resolution of the dispute, or else retain sufficient assets to pay the claim. SLI's estimated $5 million claim was listed as "disputed or contingent."

In accordance with the terms of the Disclosure Statement and paragraph 9.1 of the Plan, payments under the Plan were to be derived from sales of specific parcels of the Debtor's real and personal property.[12] The Disclosure Statement set forth the available properties, along with their current market value, existing liens, net equity, and sale deadline. If the Debtor failed to sell a property committed for sale before the Plan deadline, the Debtor could be compelled, in accordance with paragraph 9.7 of the Plan, to sell at auction.[13] Pursuant to paragraph 9.8 of the Plan, the net proceeds of any sales were required to be devoted to distributions under the Plan.[14]

---

other inclusions and deletions from the debts listed (*See* note 4 *supra*).

**11.** As noted in note 9 above, this sum differs from the original schedules due to inclusions and deletions from the debts listed (*See also,* note 4 *supra*).

**12.** Paragraph 9.1 provided that:

Lacy will sell certain assets in order to fund the Plan. During the first year following the Effective Date of the Plan, Lacy will sell one parcel of the Taggert [sic] Lakes Ranch Property. All or part of the Sullivan Canyon Property shall be sold within the two years following the Effective Date of the Plan. Lacy will liquidate his fine art and primitive collection, to the extent necessary to pay Administrative Priority Claims and Class 7 claimants, over the two years following confirmation of the Plan.

**13.** Paragraph 9.7 provided that:

In the event that either a parcel of real property or the fine are and primitive collection is to be sold by a particular date and a sale is not completed by such date, an auction of the property shall be conducted pursuant to this paragraph, to the extent necessary to pay Class 7 claimants. The auction will be conducted within sixty(6) days of the last date by which he particular property was to be sold as set forth in paragraph 9.1. Advance notice of the time and place of the auction shall be provided to each secure creditor who holds a security interest in the property to be sold and to all remaining Class 7 creditors. The auction sale shall be conducted by a licensed, experienced firm with expertise in auction sales of the type of property proposed for sale. The unsecured creditors shall be provided with forty five (45) days advance notice of the selection of an auctioneer. If a creditor does not approve of the auctioneer, they shall inform the Debtor and the parties shall use reasonable efforts to select an acceptable auctioneer. If the parties cannot agree on an auctioneer, the creditors may apply to a court of competent jurisdiction and request that the court approve or select an appropriate auctioneer.

**14.** Paragraph 9.8 provided that:

Other than as specifically provided in Article IV and in this Article IX, Debtor shall not further encumber, sell, transfer or dispose of any scheduled interest in any property, and shall not permit any of his affiliated entities to do so prior to, unless for the purpose of, payment of all allowed unsecured claims in full with interest as provided herein (except in the ordinary course of business, provided further that in the case of liens arising from refinance of any scheduled real property, the new liens shall not be in excess of 125% of the amount of the

The Debtor was otherwise prohibited from selling or encumbering the properties, with the exception that, "in the ordinary course of business" a property could be re-financed if the re-financing did not result in a loan that exceeded 125% of the loan being extinguished. The Plan and Disclosure Statement provided that the Debtor would use the rental income generated by the properties—supplemented by his own personal earnings, if necessary—to service the loans on the properties post-confirmation until they were sold.

Finally, and importantly for the purpose of adjudicating the pending Motion to Convert, Paragraph 11.2 of the Plan provided that this Court retained jurisdiction to interpret and implement the Plan and to resolve any disputes related thereto.[15]

### B. *Debtor's Performance Under the Plan*

#### 1. *Tagert Lakes Ranch*

One month prior to submitting his Plan, the Debtor had received, but rejected, a cash offer of $16.5 million for property located in Aspen, Colorado called the Tagert Lakes Ranch ("Tagert Lakes Property"). The Debtor was the manager and member of Tagert Lakes Holdings, LLC ("TLH"), the entity that owned the Tagert Lakes Property at the time the Plan was confirmed. Instead of accepting the cash offer, the Debtor proposed to obtain necessary governmental approvals to subdivide the property and sell it in separate parcels for a total of $22.8 million. The Disclosure Statement provided that the Tagert Lakes Property would be sold on or before September 18, 2001, one year from the Effective Date of the Plan. The Disclosure Statement provided that the proceeds of the Tagert Lakes Property would be subject to the secured claim of TLH and would then be available to TLH for other purposes. Debtor also agreed to direct "available funds" from the sale of the TLH property to fund the Plan to the extent necessary.

On July 2, 2002, the Debtor executed a contract to sell the entire Tagert Lakes Property for $13 million. The Tagert Lakes Property was sold on August 19, 2002 to 3282 Beach Club Drive Family

---

refinanced liens as they existed on the Effective Date).

**15.** Specifically, paragraph 11.2 provided that:

Notwithstanding confirmation of the Plan, the Court shall retain jurisdiction for the following purposes:

1. Determination of the allowability of claims upon objection to such claims by the Debtor–in–Possession, or by any other party in interest;
2. Determination of the requires for payment of claims entitled to priority under 11 U.S.C. § 507(a)(1), including compensation of the parties entitled thereto;
3. Resolution of any disputes regarding interpretation of the Plan;
4. Implementation of the provisions of the Plan and entry of orders in aid of consummation of the Plan, including without limitation, appropriate orders to protect the revested Debtor from action by creditors;
5. Modification of the Plan pursuant to 11 U.S.C. § 1127;
6. Adjudication of any causes of action, including avoiding powers actions, brought by the Debtor–in–Possession, by the representative of the estate or by a Trustee appointed pursuant to the Code;
7. Adjudication of any cause of action brought by the Debtor–in–Possession, by the representative of the estate, or by a Trustee appointed pursuant to the Code, or the revested Debtor exercising rights and powers as provided in 11 U.S.C. §§ 542–549. This section shall not be construed to limit any other power or right which the Debtor or its successor may possess under any section of the Code; and
8. Entry of a final decree.

Trust for the $13 million contract price. This was $9.8 million less than the anticipated "subdivided" value stated in the Disclosure Statement, $5 million less than the anticipated "in bulk" value in the Disclosure Statement, and $3.5 million less than the previously-rejected cash offer. In addition, at the time of the sale, the liens had increased by $3.9 million to a total of $10.9 million. The increase in debt on the property partly stems from a second deed of trust against the property, taken out by the Debtor less than two weeks after the confirmation, in the sum of $800,000. The remaining increases are the result of the Debtor's failure to keep the loan payments secured by the Tagert Lakes Property current and relate to default interest charges at rates in excess of 20%, plus delinquency charges, fees and other consequence of default.

In the end, the total net proceeds of the sale were only $1.39 million. From those proceeds, Debtor made disbursements totaling $1,158,715.00 to persons and/or entities who/that did not file claims and were not provided for in the Disclosure Statement. The recipients of these disbursements included business associates of the Debtor, the Debtor's mother, Tagert Lakes Nursery, International Property & Investments ("IPI") (a d/b/a of Debtor). In addition, approximately $200,000 of the proceeds were used to reduce the debt on Debtor's residence which has no net equity available to creditors. After these payments, the Debtor only paid $227,833.00 of the net sales proceeds to unsecured creditors provided for under the Plan and Disclosure Statement—or, approximately 3.2% of the anticipated and projected $7,182,500 liquidation proceeds from the sale of the Tagert Lakes Property.

The Debtor did not reserve any of the sale proceeds in an interest-bearing account for the payment of SLI's claim. In-

stead, the Debtor deposited the remaining proceeds—amounting to $108,000—into his general business checking account, where it was commingled with other funds.

### 2. *Sullivan Canyon Property*

The Sullivan Canyon Property is unimproved land located in the Los Angeles, California area. The Debtor proposed to subdivide and then improve this land for sale numerous home building sites. The Debtor, by his Disclosure Statement, represented that the Sullivan Canyon Property was already approved for development, but that it needed physical improvement to sell the home building sites. The Sullivan Canyon Property was subject to a $1.6 million lien which was accruing interest at the default rate of 18%. The Plan provided that this property was to be re-financed within six months of confirmation. The re-financing was to yield an additional $1 million to complete the improvements. The Sullivan Canyon Property was to be sold within two years of the Effective Date.

Seventeen months passed before the Debtor re-financed the Sullivan Canyon Property. In the meantime, the existing $1.6 million first lien on the property had incurred default rate interest of 21%, and the Debtor took out a $500,000 loan secured by a second lien on the property to meet the debt service on the first lien. The re-finance was in the sum of $2.9 million and carried an interest rate of 30%. The net proceeds from the re-finance totaled $500,000 which is, evidently, intended to be used for completing improvements.

### 3. *The Melrose Place Property*

The Melrose Place Property is commercial rental property located on Melrose Drive in Los Angeles, California. At the time this case was confirmed, this property was subject to a lien of $4.4 million. Fol-

lowing confirmation, the property went into default, but was re-financed in October 2002 for $6.1 million. Of the $1.7 million increase in the debt on this property, none of this money was used for improvements, to free up cash, or to pay creditors.[16] Instead, the entire amount went to pay default and foreclosure charges, default-rate interest, and new loan fees. The interest on the new loan plus the normal operating costs are well in excess of the monthly rental revenues produced by the property, such that the Debtor is operating this property at a loss of approximately $9,000 per month. The Debtor has also contracted with his wife to pay her a fee of $6,000 per month to manage the property, thus, increasing the operating losses to approximately $15,000.00 per month.

#### 4. *Debtor's Art Collection*

The Debtor owns a substantial art collection which he valued at $1.5 million at the time of confirmation. Based upon the evidence before the Court, including, but not limited to, a transcript of the Debtor's sworn prior testimony given at his Fed. R.Bankr.P.2004 examination taken on February 5, 2003, the Debtor does not know the value of this collection today. Moreover, he has apparently had significant turnover in his collection due to his post-confirmation "trading" of the art. The evidence at trial suggests that the property is not properly or adequately insured. Unfortunately, the Court was unable to ascertain anything further with respect to this collection in light of the Debtor's failure to attend the hearing on this matter.

#### C. *Debtor's Chapter 11 Final Report and Application for Final Decree*

On March 22, 2002, Debtor filed his Chapter 11 Final Report and Application for Final Decree. In it the Debtor represented to the Court, among other things that:

2. That the deposits required by the Plan have been distributed in accordance with the provisions of the Plan except as shown in Schedule A attached hereto;[17]

3. That substantially all of the property of the Debtor has been transferred according to the provisions of the Plan as shown in Schedule B attached hereto;[18]

---

**16.** SLI argues that the new liens and/or refinancing of the Melrose Place Property and the Sullivan Canyon Property violates paragraph 9.8 of the Plan. Paragraph 9.8 provided that the Debtor may not, outside the ordinary course of business, refinance scheduled real property with liens "in excess of 125% of the amount of the refinanced liens as they existed on the Effective Date."

In support of this contention, SLI offered the Debtor's Disclosure Statement and information related to the refinancing. The Debtor contends that this Court has insufficient evidence to make any finding that the Debtor exceeded this provision of the Plan. Moreover, Debtor claims that, with respect to the secured claims on the Debtor's real properties as of the confirmation date of the Plan, the Court has no evidence. The Debtor further claims that the Court has no evidence to indicate the amount of money due with respect to liens encumbering the Debtor's real property as of the current date. First, the information provided by SLI appears to be the only evidence available on this subject. If the Debtor intended to demonstrate differences between values and liens on the property now versus the Effective Date, it could have cooperated with SLI to obtain the same. Second, Debtor did not attend the hearing to refute any of this information.

**17.** With respect to Schedule A, under "Nature of Deposits" the Debtor states "Not applicable."

**18.** A review of Schedule B would give the impression that the Debtor had already transferred or soon would transfer property in accordance with the Plan.

5. That distribution has been commenced under the Plan, and that payments to creditors or other interested parties have been undertaken as shown ins Schedule C attached hereto; [19]

6. That all motions, contested matters, and adversary proceedings have been finally resolved, except for an adversary proceeding with Stinky Love, Inc. Such adversary proceeding is moot for two reasons. First it is a dischargeability of debt action and the Debtor has committed under his confirmed Plan to pay all allowed claims in full. Second, the claims the creditor is asserting in California for fraud have been dismissed and on information and belief the only claim remaining is an alter ego claims which would be dischargeable.

## V. CONCLUSIONS OF LAW

### A. *The Jurisdiction of this Court*

■ The Debtor contends that once the estate assets re-vest in a debtor, here, at confirmation, the Bankruptcy Court loses jurisdiction over the assets and they cannot revest in a Chapter 7 estate in the event of conversion of the case. This Court concludes that it *does* have jurisdiction to consider this matter based on (1) the express provisions of the Debtor's Plan, (2) provisions in the Bankruptcy Code, and (3) case precedent.

■ First, Debtor's Plan, paragraph 11.2, set forth in footnote 8 *supra*, expressly provides for retention of jurisdiction. The Debtor expressly and unequivocally requested that this Court retain jurisdiction to consider matters such as the one at hand. Although it is a fundamental concept in bankruptcy that parties in interest in a bankruptcy proceeding, through their actions, cannot confer jurisdiction on the bankruptcy court, when it is otherwise lacking, this Court concludes that jurisdiction, here, is not otherwise lacking. *See, e.g., In re Roger J. Au & Son, Inc.,* 123 B.R. 31 (Bankr.N.D.Ohio 1990). The Court retains jurisdiction of this case in accordance with the Debtor's original wishes.

■ Second, Debtor's contention that this Court loses jurisdiction over the assets and that those assets cannot re-vest in a Chapter 7 estate in the event of conversion would eviscerate 11 U.S.C. § 1112(b)(7) and (8) which provide for a mechanism to dismiss or convert a confirmed plan. Seemingly, the Debtor's argument would not even allow this Court to enter orders such as the final decree in a cases once confirmation has taken place and assets are re-vested in a debtor. Moreover, this Court concludes that the final decree also does not necessarily divest this Court of jurisdiction. The Advisory Committee Note to the 1991 amendments to Fed. R.Bankr.P. 3022 [20] provides:

> Entry of a final decree closing a chapter 11 case should not be delayed solely because the payments required by the plan have not been completed. *Factors that the court should consider in determining whether the estate has been fully administered include (1) whether the order confirming the plan has become final, (2) whether deposits required by the plan have been distributed, (3) whether the property proposed by the plan to be transferred has been transferred, (4)*

---

19. The information in Schedule C would suggest that payments to creditors were commenced to all creditors and interested parties.

20. Fed.R.Bankr.P. 3022 provides that:

> After an estate is fully administered in a chapter 11 reorganization case, the court, on its own motion or on motion of a party in interest, shall enter a final decree closing the case.

*whether the debtor or the successor of the debtor under the plan has assumed the business or the management of the property dealt with by the plan, (5) whether payments under the plan have commenced, and (6) whether all motions, contested matters, and adversary proceedings have been finally resolved.*

The court should not keep the case open only because of the possibility that the court's jurisdiction may be invoked in the future. *A final decree closing the case after the estate is fully administered does not deprive the court of jurisdiction to enforce or interpret its own orders and does not prevent the court from reopening the case for cause pursuant to § 350(b) of the Code.* For example, on motion of a party in interest, the court may reopen the case to revoke an order of confirmation procured by fraud under § 1144 of the Code. If the plan or confirmation order provides that the case shall remain open until a certain date or event because of the likelihood that the court's jurisdiction may be required for specific purposes prior thereto, the case should remain open until that date or event.

(emphasis added).

Third, case law support that this Court has jurisdiction to consider and dispose of this matter. *See, e.g., Donaldson v. Bernstein (In re Donaldson),* 104 F.3d 547 (3d Cir.1997)(the Third Circuit concluded that a bankruptcy court did not abuse its discretion, and had subject matter jurisdiction, in reopening a closed Chapter 11 case and converting it into a Chapter 7 case, where the debtor failed to make payments and required under the plan); *In re Jordan Mfg. Co.,* 138 B.R. 30, 35 (Bankr. C.D.Ill.1992) (the entry of a final decree should not be delayed because the bankruptcy court's jurisdiction might be required in the future); *see also,* the 1991

Advisory Committee Note to Fed. R.Bankr.P. 3022.

**B.** *11 U.S.C. § 1112(b) Standards for Conversion*

1. *Overview*

SLI's Motion is filed pursuant to 11 U.S.C. § 1112(b)(2), (3), (7) and (8). In particular, 11 U.S.C. § 1112(b) provides that:

on request of a parties in interest or the United States trustee or bankruptcy administrator, and after notice and a hearing, the court may convert a case under this chapter to a case under chapter 7 of this title or may dismiss a case under this chapter, whichever is in the best interest of creditors and the estate, for *cause,* including—

. . .

(2) inability to effectuate a plan;

(3) unreasonable delay by the debtor that is prejudicial to creditors;

. . .

(7) inability to effectuate substantial consummation of a confirmed plan;

(8) material default by the debtor with respect to a confirmed plan...

(emphasis added).

"Courts have universally recognized that the listing of items in § 1112(b) is non-exhaustive ... Subsection (b) gives wide discretion to the court to make an appropriate disposition of the case ... The court will be able to consider other factors as they arise, and to use its equitable powers to reach an appropriate result in individual cases." *In re Pacific Rim Investments, LLP,* 243 B.R. 768, 771–72 (D.Colo.2000) (quoting S.Rep.No. 989, 95th Cong., 2d Sess. 117 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5903). Thus, courts have often found cause for conver-

sion where there is evidence of post-confirmation debtor misconduct. *Donaldson v. Bernstein (In re Donaldson)*, 104 F.3d 547, 553 (3rd Cir.1997)("[post-confirmation] misconduct by the debtor often compels the court to allow the fraud to be redressed"); *In re Hampton Hotel Investors, L.P.*, 270 B.R. 346, 358 (Bankr.S.D.N.Y.2001); *see In re Hiller*, 143 B.R. 263 (Bankr.D.Colo.1992).

■■■ The decision to convert a Chapter 11 case to Chapter 7 is addressed to the sound discretion of the Court. *In re Preferred Door Co., Inc.*, 990 F.2d 547, 549 (10th Cir.1993); *In re Western Pacific Airlines, Inc.*, 218 B.R. 590, 593–594 (Bankr.D.Colo.1998). Likewise, if "cause" is established, the choice between conversion and dismissal is left to the discretion of the Court, based upon the best interest of the estate and the creditors. *In re Western Pacific, supra*, 218 B.R. at 595. The fact that a plan has been confirmed and the case administratively closed does not divest the Court of the power to reopen and convert. *Donaldson*, 104 F.3d at 552–54 (3rd Cir.1997); *In re Jordan Manufacturing Co., Inc.*, 138 B.R. 30, 35 (Bankr.C.D.Ill.1992).

### 2. *Burden of Proof*

■■■ Generally, the burden of proof under 11 U.S.C. § 1112(b) rests with the party requesting the relief. 7 LAWRENCE P. KING, COLLIER ON BANKRUPTCY ¶ 1112.04[8](15th ed.2000); *see also, In re Lizeric Realty Corp.*, 188 B.R. 499, 503 (Bankr.S.D.N.Y.1995). Where, as here, the matter is contested, the party seeking conversion must demonstrate the existence of "cause" by a fair preponderance of the evidence. *In re Woodbrook Assoc.*, 19 F.3d 312, 317 (7th Cir.1994). Here, the burden of proof rests with SLI.

### C. *"Cause" for Conversion Exists*

#### 1. *An Overview of "Cause"*

■■■ "Cause" for conversion of this case has been established by the facts and evidence before this Court. In particular, this Court concludes that "cause" exists under 11 U.S.C. § 1112(b)(2), (3) and (7). "Inability to effectuate," as that phrase appears in 11 U.S.C. § 1112(b)(2) and (7) exists where "the debtor lacks the ability to formulate a plan or to carry one out," *Hall v. Vance*, 887 F.2d 1041, 1044 (10th Cir.1989), or where "a plan has been confirmed and the debtor cannot fulfill his obligations thereunder," *In re Brent Explorations, Inc.*, 91 B.R. 104, 110 (Bankr.D.Colo.1988). The term "unreasonable delay" in 11 U.S.C. § 1112(b)(3) is not limited to delay in formulating a plan, but rather includes the debtor's *performance* under a confirmed plan. *In re Consolidated Pioneer Mort. Entities*, 248 B.R. 368, 378 (9th Cir. BAP 2000), *aff'd*, 264 F.3d 803 (9th Cir.2001). For the reasons set forth herein, this Court concludes that SLI has demonstrated, by a fair preponderance of the evidence, that the Debtor has: (1) been unable to effectuate—or carry out—his Plan and (2) unreasonably delayed his creditors—in particular, SLI.

#### 2. *The Facts of this Case Demonstrate "Cause" for Conversion*

■■■ The Debtor re-financed the Melrose Place property for an amount well in excess of the Plan's limitation of 125%; that Plan provision was expressly bargained for by SLI, for its own protection, during the confirmation process. The Debtor did not re-finance the Sullivan Canyon property until almost a year after the Plan deadline for doing so, and incurred enormous default charges in the process. The eventual re-finance was at a 30% interest rate, at a time when mortgage rates have been at historic lows. The

Debtor *did not timely service* the secured loans against *any* of his properties as required by the Plan, and has incurred enormous and unnecessary default and delinquency charges as a result. In fact, it appears that the total of such delinquency costs *alone* would have been enough to satisfy most of SLI's claim. Indeed, equity in the Debtor's assets has inexplicably disappeared and equity available from his property for creditors has vanished.

Once Tagert Lakes was sold, the Debtor diverted substantial proceeds from the Tagert Lakes sale to himself and to insiders, but did not reserve *any* of those proceeds to pay SLI's claim, nor has he retained sufficient assets to do so. To the contrary, as a consequence of the Debtor's loans defaults, along with his severe business misjudgment—or mismanagement—regarding Tagert Lakes, the equity available to his unsecured creditors has plummeted from $12.6 million as of confirmation to *only* $4.1 million today. There is no evidence before the Court that any of the remaining real properties are actively or currently listed for sale, nor has the Debtor undertaken the steps necessary to sell his art collection. In light of the 30% interest rate on the Sullivan Canyon Property loan and the mounting losses at Melrose Place, even the little equity remaining for the creditors today will, most likely, soon evaporate, particularly if this case were dismissed and the creditors forced to pursue lengthy state-court collection actions.

In refuting whether "cause" has been met, the Debtor contends that because he has appealed the judgment entered in favor of SLI, he is still completely free to deal with his property as he wishes pending the outcome of that appeal, and that he anticipates significant financial success with respect to his Sullivan Canyon Property home-building project. That is, the Debtor believes that there is no evidence before the Court to indicate that the Debtor does not have sufficient funds or assets to enable the payment of creditors with allowed Class 7(b) claims on or before September 17, 2003, or within 60 days thereafter if creditors use the auction procedures at paragraph 9.7 of the Plan.

The Debtor's argument regarding the viability of the Sullivan Canyon Property home-building project is either overly optimistic or disingenuous. Debtor's folly with Tagert Lakes does not imbue confidence in the Sullivan Canyon Property development. Moreover, what he now proposes essentially amounts to gambling with the creditors' money: he himself will garner the profits if the Sullivan Canyon project is successful, but his creditors—primarily SLI—will bear the loss if it fails. Most importantly, this is *not* the agreement embodied in the Plan: regardless of whether or not SLI's claim remained disputed, the Debtor was required to liquidate his assets promptly for the benefit of creditors, not to engage in open-ended and speculative development projects. Nor was the Debtor to unabashedly encumber or dissipate equity in assets of the estate. The disastrous decline in the amount of money now available to the creditors did not result from market forces beyond the Debtor's control; rather, it has resulted from the Debtor's conscious decision to disregard the rights of his creditors and his duties under the Plan.

The Debtor has entirely failed to perform in conformity with the Plan, and evinces no intention of doing so in the future. This Court therefore concludes that, for "cause," SLI is entitled to conversion and the appointment of a trustee to preserve and effectuate its rights under the Plan.

**D.** *The Status Of The Plan Assets Post–Conversion*

The Debtor contends that, even if he has breached his duties under the Plan, his creditors have no remedy in this Court. He argues that upon confirmation of his Plan all of the property of his Chapter 11 estate re-vested in him personally pursuant to 11 U.S.C. § 1141(b),[21] and that the Plan property remaining today would *not* revert to the Chapter 7 estate if conversion were ordered. Thus conversion would be pointless because there would be no property for the Chapter 7 trustee to administer, and his creditors' sole recourse now is to attempt to pursue him in state court. Several courts have accepted this argument. *See In re Canal St. Ltd. Partnership,* 260 B.R. 460 (Bankr.D.Minn. 2001); *In re K & M Printing, Inc.,* 210 B.R. 583 (Bankr.D.Ariz.1997); *In re BNW, Inc.,* 201 B.R. 838 (Bankr.S.D.Ala.1996); *In re Winom Tool & Die, Inc.,* 173 B.R. 613 (Bankr.E.D.Mich.1994); *In re T.S. Note Co.,* 140 B.R. 812 (Bankr.D.Kan. 1992); *In re T.S.P. Indus., Inc.,* 117 B.R. 375 (Bankr.N.D.Ill.1990).

SLI counters that 11 U.S.C. § 1112(b)(7) and (8) expressly provide for *post-confirmation* conversion. SLI argues that section 1112(b)(7) and (8) and other provisions of the Code establish that Congress must have intended a reversion of the debtor's remaining property into the Chapter 7 estate upon conversion. Several courts have adopted this view as well. *See In re Consolidated Pioneer Mortg. Entities,* 264 F.3d 803 (9th Cir.2001); *In re Smith,* 201 B.R. 267 (D.Nev.1996), *aff'd mem.,* 141 F.3d 1179 (9th Cir.1998); *In re RJW Lumber Co.,* 262 B.R. 91 (Bankr.N.D.Cal.2001);

*In re Calania Corp.,* 188 B.R. 41 (Bankr. M.D.Fla.1995); *In re Midway, Inc.,* 166 B.R. 585 (Bankr.D.N.J.1994); *In re NTG Indus., Inc.,* 118 B.R. 606 (Bankr.N.D.Ill. 1990). (To the same effect, but without any in-depth discussion, are *Abbott v. Blackwelder Furniture Co. of Statesville, Inc.,* 33 B.R. 399 (W.D.N.C.1983), and *In re Nardulli & Sons Co.,* 66 B.R. 871, 876 (Bankr.W.D.Pa.1986), *aff'd,* 836 F.2d 184 (3rd Cir.1988).). This is a legal issue which has divided the courts.[22] In fact, there is no clear guidance from this District or the Tenth Circuit on the issues raised by the parties herein. That being said, this Court finds it unnecessary to enter the debate given the particular factual circumstances presented here.

■ 11 U.S.C. § 1141(b) provides for re-vesting of property in the reorganized debtor *only to the extent* contemplated by the reorganization plan. In business reorganization, the reorganized debtor is free to deal with its property as necessary in order to compete in the business world without the aid of bankruptcy court protection, while its pre-petition creditors—as contract claimants under the plan—occupy the same position as ordinary post-petition trade creditors. However, the situation is markedly different in the case of a plan of liquidation. Where, as here, a liquidating plan (1) requires the debtor to liquidate remaining assets, (2) requires that the liquidation proceeds be held for the benefit of the creditors, (3) restricts the debtor's freedom to deal otherwise with the plan property, and (4) provides for continuing bankruptcy court supervision of the plan's implementation, the combined effect of these provisions is that the property did

---

**21.** 11 U.S.C. § 1141(b) provides: "Except as otherwise provided in the plan or the order confirming the plan, the confirmation of a plan vests all of the property of the estate in the debtor."

**22.** This issue was noted, but not resolved, by *In re K.D. Co., Inc.,* 254 B.R. 480, 488 n. 7 (10th Cir. BAP 2000).

*not* fully, and without qualification or reservation, re-vest in the reorganized debtor upon confirmation (notwithstanding any contrary boilerplate language in the plan). Rather, the reorganized debtor holds that property subject to the plan and for the benefit of creditors, who retain a contingent or equitable interest therein. Since the property did not fully, and without qualification, re-vest in the reorganized debtor, 11 U.S.C. § 1141(b) by its terms does not apply, and any property remaining at conversion becomes property of the Chapter 7 estate. *Consolidated Pioneer Mortg. Entities*, 248 B.R. at 376 (if the plan creates a trust or a vehicle for the exclusive benefit of the creditors, then the trust has a fiduciary duty to those whose benefit it was created); *Hillis Motors, Inc. v. Hawaii Automobile Dealers' Ass'n*, 997 F.2d 581, 589–90 (9th Cir.1993) (court concluded that the plan proposed by the debtor was atypical as it contemplated that any discharge would occur in the future, a trustee maintained control of the assets and the bankruptcy court would supervise the case post-confirmation); *In re Smith*, 201 B.R. at 272 ("If section 548 [sic [23]] truly vested property in the debtor in such a way that it could never be reached by a court, there would be no way to enforce a confirmed plan under Chapter 11.").

A key to this decision—and material to the propriety and efficacy of the Final Decree—is whether the Debtor, in fact, effected "substantial consummation of a confirmed plan." "Substantial consummation is a defined term under the Code." 11 U.S.C. § 1101. Section 1101(2) provides:

"substantial consummation" means—

(A) transfer of all or substantially all of the property proposed by the plan to be transferred;

(B) assumption by the debtor or by the successor to the debtor under the plan of the business or of the management of all or substantially all of the property dealt with by the plan; and

(C) commencement of distribution under the plan.

The Court concludes that "substantial consummation" did *not* occur in this case as there was not a "transfer of all or substantially all of the property proposed by the plan to be transferred." Thus, the first element of 11 U.S.C. § 1101(2) was not met. Here, the Debtor's Plan requires the Debtor to sell his property for the benefit of the creditors. The Plan curtails the Debtor's freedom to encumber or sell the property and to dispose of the proceeds, and provides for involuntary sales of the property if necessary. The Plan also calls for continuing supervision by this Court of its implementation; in fact, certain provisions of the Plan *expressly contemplate* the potential appointment of a trustee. Thus, the reorganized Debtor holds the Plan property subject to the Plan and for the benefit of the creditors, such that the property did *not* fully, and without any qualification, re-vest in the Debtor. Therefore, 11 U.S.C. § 1141(b) does not prevent the property from entering the Chapter 7 estate upon conversion.

 There is another reason that such a result is appropriate here. SLI is not seeking to abrogate or modify the Debtor's confirmed Plan; it *merely* seeks to have an independent fiduciary implement the Plan according to the terms contained therein. 11 U.S.C. § 1142(b) provides that, after plan confirmation,

The court may direct *the debtor* and any other necessary party . . . to effect a

---

**23.** Reference to section 548 appears to be in error in the *Smith* decision as this quotation is in the context of confirmation, vesting of

assets and the application of 11 U.S.C. §§ 348, 541, 1141 and 1112(b).

transfer of property dealt with by a confirmed plan, and to perform any act ... that is *necessary for the consummation of the plan.* [emphasis added]

This is precisely what SLI here seeks: a transfer of the Plan property to the Chapter 7 estate in order that the Plan may be carried out.

In sum, the plain language of the pertinent Code provisions, and the language and intent of the Plan itself, all lead to the conclusion that this Court may direct that the remaining property to be administered under the Plan shall become part of the Chapter 7 estate upon conversion, and the Court shall so order.

Finally, while the Debtor contends that conversion of this case would unfairly prejudice all of the creditors and third-parties who have acted in reliance on the Plan, this Court does not believe that this contention is accurate. In fact, the Court does not see any prejudice to creditors in converting this case. The prejudice that exists here is if the Debtor continues to retain control and supervision of his assets. Based upon all reasonable inferences founded in the evidence before the Court, the Debtor has not performed under the Plan and has managed his affairs so as to benefit himself, his companies, friends, associates and family. The substantial prejudice here is to the Debtor's largest creditor—SLI—and its claim being subjected to (a) interminable litigation facilitated by the shield of this bankruptcy case and/or (b) various machinations to avoid payment to SLI, be it through legal gymnastics in state court or courts other than this bankruptcy court.

## VI. CONCLUSION AND ORDER

For the reasons set forth above, this Court concludes that conversion pursuant to 11 U.S.C. § 1112(b) is warranted in this case. Accordingly, it is

ORDERED as follows:

1. The Motion to Convert (Docket No. 237) is GRANTED; and this case is HEREBY converted to a case under Chapter 7 of the Bankruptcy Code. The United States Trustee shall, forthwith, appoint a Trustee in the within Chapter 7 case.

2. The Debtor, its agents, servants, employees, and attorneys are herein enjoined from taking any action with respect to any assets or records of the Debtor, save and except to preserve the same.

3. The Debtor shall:

 (1) forthwith turn over to the Chapter 7 Trustee all records and property of the Estate under its custody and control as required by Rule 1019(4), Fed.R.Bank.P.; and

 (2) On or before **September 22, 2003**, file an accounting of all receipts and distributions made, together with a schedule of all unpaid debts incurred after the commencement of the Chapter 11 case, as required by Rule 1019(5)(A) and (B), Fed.R.Bank.P.

4. The Debtor shall on or before **September 5, 2003**, file the statements and schedules required by Rules 1019(1)(A) and 1007(b), Fed.R.Bank. P., if such documents have not already been filed.

5. The Debtor shall, on or before **September 22, 2003**, since this case is converted after the confirmation of a plan, file:

 (1) a schedule of all property not listed in the final report and account of the Debtor–in–Possession which was acquired after the commencement of the Chapter 11 case but

before the entry of this conversion order,

(2) a schedule of executory contracts entered into or assumed after the commencement of the Chapter 11 case but before the entry of this conversion order, and

(3) a schedule of unpaid debts not listed in the final report and account of the Debtor–in–Possession which were incurred after the commencement of the Chapter 11 case but before the entry of this conversion order, as required by Rule 1019(5)(A) and (B), Fed.R.Bank.P.; and

(4) a statement of intention with respect to retention or surrender of property securing consumer debts, as required by 11 U.S.C. § 521(2)(A) and Rule 1019(1)(B), Fed.R.Bank.P., and conforming to Official Form 8.