NOT FOR PUBLICATION

FILED

MAY 29 2013

SUSAN M SPRAUL, CLERK
U.S. BKCY. APP. PANEL
OF THE NINTH CIRCUIT

**UNITED STATES BANKRUPTCY APPELLATE PANEL**

**OF THE NINTH CIRCUIT**

| | |
|---|---|
| In re: | BAP No.   AZ-12-1320-MkDJu |
| PETER F. BRONSON AND SHERRI L. BRONSON, | Bk. No.   08-00777 |
| Debtors. | |
| PETER F. BRONSON; SHERRI L. BRONSON, | |
| Appellants, | |
| v. | **MEMORANDUM**[*] |
| THOMAS M. THOMPSON, | |
| Appellee. | |

Submitted Without Oral Argument
on May 16, 2013

Filed – May 29, 2013

Appeal from the United States Bankruptcy Court
for the District of Arizona

Honorable George B. Nielsen, Jr., Bankruptcy Judge, Presiding

Appearances:   Appellants Peter Bronson and Sherri Bronson on brief pro se; Jimmie D. Smith on brief for appellee Thomas M. Thompson.

Before:   MARKELL, DUNN and JURY, Bankruptcy Judges.

[*]This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have (see Fed. R. App. P. 32.1), it has no precedential value. See 9th Cir. BAP Rule 8013-1.

**INTRODUCTION**

Peter and Sherri Bronson ("Bronsons") appeal from an order granting the motion of Thomas Thompson ("TMT") to convert the Bronsons' bankruptcy case from chapter 11[1] to chapter 7. The Bronsons also appeal from an order denying their motion to reconsider the conversion order. We AFFIRM both orders.

**FACTS**

Notwithstanding the contentious nature of the litigation between the parties, most of the facts relevant to this appeal are undisputed.

**A.    Purchase of Office Building and Default on Financing**

In 2001, the Bronsons and their business partner Carl Mickler purchased from TMT and his parents a 39,000 square foot commercial building in Miami, Arizona ("Office Building") for $170,000.[2] The purchasers paid $25,000 at the time of the sale and executed a promissory note ("Note") for the remainder of the purchase price. The Note was secured by a deed of trust and assignment of rents ("Deed of Trust").[3]

The Note provided for monthly payments of $1,272.00, with a

---

[1]Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and all "Rule" references are to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037. All "Civil Rule" references are to the Federal Rules of Civil Procedure.

[2]The Bronsons later acquired from Mickler his 50% interest in the Office Building.

[3]The Note and Deed of Trust also named TMT's parents as parties to the transaction; however, their involvement is not relevant to our analysis and disposition of this appeal. For ease of reference, we refer herein to both TMT alone and TMT along with his parents as TMT.

2

balloon payment for the remaining balance due in September 2007. When the Bronsons defaulted on the balloon payment, TMT commenced nonjudicial foreclosure proceedings. In furtherance thereof, TMT recorded in October 2007 a notice of trustee's sale, which provided for an auction sale to be held on January 29, 2008.

**B.   Bankruptcy Filings, Relief from Stay and Foreclosure**

On January 28, 2008, the day before the scheduled trustee's sale, the Bronsons filed their chapter 11 bankruptcy petition. As a result of the automatic stay, the trustee's sale could not be held as scheduled. Before he could proceed with the trustee's sale, TMT had to obtain relief from the automatic stay not only in the Bronsons' bankruptcy case but also in the bankruptcy case of the Bronsons' business associate Mark Taylor, who claimed to hold a junior security interest against the Office Building. TMT obtained relief from stay in the Bronsons' bankruptcy case as of November 19, 2008 and in Taylor's bankruptcy case as of June 30, 2009. The trustee's sale was held on July 13, 2009, at which TMT was the successful bidder based on a credit bid of $200,000. A trustee's deed was recorded on July 17, 2009.

**C.   Nondisclosure Lawsuit and Allowance of Judgment Claim**

Even though the Bronsons had lost title to the property by way of the foreclosure, this did not end the litigation between the parties. In 2007, the Bronsons had commenced a lawsuit against TMT in the Gila County Superior Court (Case No. 2007-0264), alleging among other things breach of contract, nondisclosure, concealment and fraud ("Nondisclosure Lawsuit"). The Bronsons claimed that TMT had wrongfully failed to disclose asbestos contamination in the Office Building.

3

At the time of the trustee's sale, the Nondisclosure Lawsuit was still pending.[4] Ultimately, however, TMT prevailed in that action. In June 2010, the Gila County Superior Court entered summary judgment in favor of TMT with respect to all of the Bronsons' claims and awarded TMT his attorney's fees and costs in that action in the amount of $26,426.00 ("Gila Judgment").

TMT filed a motion in the bankruptcy court seeking to have the Gila Judgment allowed as an administrative expense. The Bronsons duly opposed that motion. After a hearing on the matter, the bankruptcy court declined to allow the Gila Judgment as an administrative expense claim but instead entered an order allowing it as a prepetition unsecured claim ("Gila Judgement Claim Allowance"). The Bronsons never appealed either the Gila Judgment or the Gila Judgement Claim Allowance.

**D.    Deficiency Lawsuit**

Meanwhile, in October 2009, Thompson filed an adversary complaint against the Bronsons asserting that he was entitled to a deficiency judgment against them under A.R.S. § 33-814(A) ("Deficiency Lawsuit").[5]

---

[4]The Bronsons removed the Nondisclosure Lawsuit to the bankruptcy court in September 2009, but the bankruptcy court entered an order in December 2009 remanding that matter to the Gila County Superior Court.

[5]A.R.S. § 33-814(A) provides in relevant part:

[W]ithin ninety days after the date of sale of trust property under a trust deed pursuant to § 33-807, an action may be maintained to recover a deficiency judgment against any person directly, indirectly or contingently liable on the contract for which the trust

(continued...)

4

Three principal issues arose in the Deficiency Lawsuit: (1) whether TMT actually incurred attorney's fees in enforcing his rights under the Note and the Deed of Trust, (2) the reasonableness of any such fees, and (3) whether the amount of debt that the Bronsons owed TMT actually exceeded the fair market value of the Office Building at the time of the foreclosure sale. The Bronsons initially raised each of these issues in a Civil Rule 12(b)(6) motion to dismiss. In ruling on that motion, the bankruptcy court held that TMT needed to amend his complaint to allege the amount of fees actually incurred and to allege that those fees were reasonable. But the court otherwise denied the Bronsons' dismissal motion.

Over the next two years, the parties litigated over the two fee-related issues (jointly, "Fee Issues") but largely ignored the third issue regarding the fair market value of the Office Building ("FMV Issue"). At the January 8, 2010 hearing on the Bronsons' dismissal motion, the Bronsons orally requested that the court set a hearing to determine the FMV Issue. The court, however, indicated that TMT first should file his amended complaint and that the Bronsons should answer that complaint. The court further suggested that the Bronsons should bring up

___

[5](...continued)
deed was given as security . . . . In any such action against such a person, the deficiency judgment shall be for an amount equal to the sum of the total amount owed the beneficiary as of the date of the sale, as determined by the court less the fair market value of the trust property on the date of the sale as determined by the court or the sale price at the trustee's sale, whichever is higher.

5

their request for a hearing on the FMV Issue at the next status conference (scheduled for February 2010), but the Bronsons did not do so. The litigation subsequently focused on the Fee Issues because TMT filed in May 2010 a summary judgment motion seeking partial summary adjudication of the Fee Issues. As the Bronsons have admitted, TMT's summary judgment motion did not address the FMV Issue at all. The Bronsons filed a cross-motion for partial summary judgment in September 2010, but that motion like TMT's motion only addressed the Fee Issues.

The court never explicitly stated that it was denying the cross-motions for summary judgment, but it did orally rule at a hearing held on September 30, 2010, that it needed an evidentiary hearing on the Fee Issues. At the same hearing, the court indicated that it was aiming to cut off both discovery and dispositive motions by no later than December 2010.

The court set trial on the Fee Issues for April 2011; however, shortly before the scheduled trial date, the Bronsons' attorney obtained permission to withdraw as counsel.[6] As a

---

[6]According to the Bronsons' former counsel, he felt compelled to withdraw because he felt that his life and his girlfriend's life were being threatened as a result of his litigation efforts against TMT. The Bronsons followed up with their own list of events and occurrences which they felt demonstrated that TMT's influence over others in the local area was causing them to experience hostility and unfair treatment from, among others, the local state courts and the local police department. But the claims of misconduct and improper influence are based largely on hearsay and conjecture. Even the Bronsons admitted that it was not possible for them to directly tie TMT to the events and occurrences they were complaining about. More importantly, the only relief the Bronsons sought in conjunction with the above-reference alleged events was for the bankruptcy
(continued...)

6

result, TMT did not present his case in chief on the Fee Issues until May 24, 2011, and the Bronsons did not present their defense case on the Fee Issues until September 15, 2011. After closing arguments by both sides and the filing of a closing statement ("Closing Statement") by the Bronsons, the court on October 30, 2011 entered judgment in TMT's favor on the Fee Issues and further purported to finally determine that TMT was entitled to a deficiency judgment in the amount of $18,574.

The Bronsons filed a series of motions seeking relief from the deficiency judgment. These motions caused the bankruptcy court to partially reconsider its October 30, 2011 judgment. While the court upheld its ruling on the Fee Issues, the court concluded that the parties had never litigated the FMV Issue. Accordingly, the court vacated the portions of the October 30, 2011 judgment purporting to finally determine that TMT was entitled to a deficiency judgment.[7] The court set the FMV Issue for trial in May 2012, but before that trial occurred, the court vacated the trial date in light of the conversion of the case to chapter 7, as discussed below.

_____

[6](...continued)
court: (1) to permit withdrawal of their counsel, (2) to grant a continuance of the pending litigation, and (3) to "order" an FBI investigation. The court permitted the withdrawal and granted the continuance. And as for the FBI investigation, the bankruptcy court later correctly pointed out that it had no authority to "order" the FBI to do anything. Oddly, the Bronsons apparently never attempted to contact the FBI themselves.

[7]The Bronsons filed an appeal from the court's partial denial of their motions for relief from the deficiency judgment, but we dismissed that appeal as interlocutory by order entered August 29, 2012 (BAP No. AZ-12-1058).

**E.   Plan Confirmation Proceedings**

During the course of the chapter 11 proceedings, the Bronsons proposed two plans.  The Bronsons' first proposed plan was premised on the sale or refinancing of the Office Building.  The Bronsons abandoned that plan shortly after TMT foreclosed on the Office Building.  The Bronsons thereafter proposed an amended plan.  The amended plan provided three sources of funding: (1) proceeds from litigation against TMT; (2) proceeds from litigation and judgments against others; and (3) sale of a parcel of real property known as the "Railroad Property" or as the "Commercial Land."  TMT objected to the Bronsons' amended plan.  TMT argued that the amended plan did not satisfy the best interests of creditors test under § 1129(a)(7).  TMT further argued that the proposed means of funding the amended plan would be insufficient in light of the actual value of the Railroad Property and the value of the Bronsons' litigation and judgments against others.  In addition, according to TMT, the amended plan did not meet the requirements of § 1129(a)(15) (which requires debtors under certain circumstances to commit their projected disposable income to plan funding) and § 1129(a)(9) (which generally requires debtors to pay allowed administrative claims in full upon confirmation).  TMT also claimed that the plan was not proposed in good faith, as required by § 1129(a)(3).

In response to TMT's plan objections, the Bronsons contended that, in light of TMT's foreclosure on the Office Building, all of TMT's claims against the Bronsons had been satisfied, and so TMT no longer held any allowable claim against the Bronsons'

8

bankruptcy estate.[8]  Therefore, the Bronsons reasoned, TMT had no standing to object to their amended plan.

The bankruptcy court held multiple hearings on the Bronsons' amended plan and considered the issues referenced above as well as other issues.  Ultimately, the court sustained most of TMT's objections to plan confirmation, as reflected in the court's order entered on January 21, 2011.[9]  Even though the Bronsons' bankruptcy case remained in chapter 11 for another 14 months before the court converted the case to chapter 7, the Bronsons never filed a new proposed plan attempting to cure the defects the court had identified in their amended plan.

**F.   TMT's Motions to Convert**

TMT filed his first motion to dismiss or convert ("First Conversion/Dismissal Motion") in February 2009.  The bankruptcy court in effect let the First Conversion/Dismissal Motion trail the confirmation proceedings.  When the Bronsons abandoned their initial proposed plan in July 2009 (in light of the foreclosure of the Office Building), the court set the First Conversion/Dismissal Motion for hearing.  The Bronsons opposed that motion, and on September 22, 2009, the bankruptcy court orally ruled on that motion.  The court wanted to give the Bronsons another opportunity to propose a confirmable plan, but the court also acknowledged TMT's complaints regarding the

---

[8]Of course, this contention was the subject of the Deficiency Litigation, which has not been fully resolved.

[9]While the voluminous record contains multiple transcripts, neither party provided us with the transcript from the January 11, 2011 hearing on plan confirmation, held just before the court entered its order sustaining TMT's objections.

9

Bronsons' delay in moving their chapter 11 case forward. With these considerations in mind, the court orally ruled that the Bronsons would have until October 22, 2009, to file an amended plan and disclosure statement. If the Bronsons did not timely do so, the court indicated it was prepared to convert the case. If the Bronsons did timely file an amended plan and disclosure statement, the court indicated that this would "moot out" the First Conversion/Dismissal Motion.[10]

Consistent with the bankruptcy court's ruling, the Bronsons filed their amended plan and disclosure statement on October 22, 2009. As mentioned above, the Bronsons proposed to fund and effectuate their amended plan through the proceeds from various lawsuits and judgments and by selling the Railroad Property. As also mentioned above, TMT objected to the amended plan based in part on the Bronsons' alleged noncompliance with various portions of § 1129(a) and in part on the allegedly minimal value of the assets the Bronsons proposed to use for plan funding.

Roughly one year later, in October 2010, while the battle over the amended plan was still ongoing, TMT filed a "Renewed Motion to Convert Case to Chapter 7." ("Second Conversion/ Dismissal Motion"). TMT's grounds for conversion or dismissal were similar to his objections to the amended plan. More specifically, TMT asserted:

• The Bronsons' chapter 11 case was two and one half years old, and still they had not been able to confirm a plan.

---

[10]The bankruptcy docket indicates that the bankruptcy court never entered a written order memorializing its oral ruling on the First Conversion/Dismissal Motion.

10

- During the pendency of the chapter 11 case, the Bronsons had accrued unpaid administrative expenses in excess of $100,000.

- The Bronsons had scheduled roughly $375,000 in general unsecured debts, none of which had been paid or otherwise resolved.

- The Bronsons had not managed to sell any of the real property assets they had proposed selling in either of their proposed plans.

- The Bronsons had not been successful in most of their litigation against others and had not collected from most of those parties against whom they held judgments.[11]

- The Bronsons' chapter 11 operating reports showed little cash on hand, even though the Bronsons had not made any payments on account of either unsecured claims or administrative claims during the course of their chapter 11 case.

- The Bronsons had little regular income and had not shown any willingness to contribute other nonexempt assets towards the funding of their proposed amended plan.

- The Bronsons' creditors would be best served by the liquidation of the Bronsons' assets by a chapter 7 trustee.

Second Conversion/Dismissal Motion (Oct. 28, 2010) at pp. 1-3.

_____

[11]The Bronsons were successful in their litigation against the Arizona Department of Environmental Quality ("ADEQ"). As a result of a state appellate court judgment in their favor and a subsequent settlement, the Bronsons apparently obtained a recovery of $33,000. But the record indicates that the amount recovered only served to defray a portion of the attorney fees and costs the Bronsons incurred in that litigation.

11

The Bronsons opposed the Second Conversion/Dismissal Motion. The Bronsons argued that, but for TMT, their amended plan already would have been confirmed, as TMT was the only person who had objected to their amended plan. The Bronsons further argued that TMT had no standing either to object to their plan or to seek conversion of their case. According to the Bronsons, all of TMT's claims had been satisfied by his foreclosure on the Office Building, and all of the claims TMT had asserted since that foreclosure were meritless.

Even though the bankruptcy court sustained most of TMT's objections to the Bronsons' amended plan in January 2011, and even though the Bronsons did not thereafter propose a new plan, the bankruptcy court did not hold a hearing on the the Second Conversion/Dismissal Motion until April 12, 2012. A week before the hearing on the Second Conversion/Dismissal Motion, the Bronsons filed a motion to continue that hearing. In support of their motion to continue, the Bronsons argued that the court should first resolve all of the disputes concerning TMT's claims and concerning the Deficiency Lawsuit. According to the Bronsons, once they had prevailed in those disputes, TMT would no longer have any claims against the Bronsons, and hence TMT would have no standing in the Bronsons' bankruptcy case. Therefore, the Bronsons reasoned, they would be able to move forward with a new plan and disclosure statement without any interference from TMT. The bankruptcy court denied the continuance motion without

///

///

///

12

explaining its reasoning.[12]

At the April 12, 2012 hearing, before permitting either side to argue, the bankruptcy court expressed its concerns regarding the viability of the Bronsons reorganizing under chapter 11. It asked the Bronsons to address whether they had the financial resources to fund a chapter 11 plan. In particular, the court asked the Bronsons to update the court on the prospective revenue sources the Bronsons relied upon in support of their amended plan. More specifically, the court asked the Bronsons whether any progress had been made to sell the Railroad Property. The court also noted that the Nondisclosure Lawsuit, another prospective source of plan funding, had been decided against the Bronsons. In addition, the court asked the Bronsons for an update regarding their efforts to collect on judgments they had obtained against third parties.

The Bronsons did not address the court's questions and concerns. Instead, they recapitulated the contentions they had made in their written opposition to the Second Conversion/Dismissal Motion, particularly the need to complete their litigation with TMT.

The court was not persuaded by the Bronsons' presentation. After each side argued, the court orally announced its findings and conclusions. First, the court concluded that TMT had standing. Based on § 1109(b) and prior decisions of this Panel,

---

[12]Notwithstanding the absence of explicit reasoning for the denial of the continuance motion, the record indicates that the bankruptcy court disagreed with the Bronsons' belief that resolving their disputes with TMT was going to enable the Bronsons to propose and effectuate a confirmable plan.

13

the bankruptcy court held that TMT was a party in interest entitled to oppose the Bronsons plan and to seek conversion even though the Bronsons disputed his claims.

The court then went on to address the merits of the conversion motion. According to the court, cause existed under § 1112(b) to dismiss or convert. The court further noted that based on the particular circumstances of the Bronsons' case, conversion was appropriate. In so ruling, the court pointed to several circumstances, including but not limited to the following: (1) the length of time the case had been pending without a confirmed plan (over four years); (2) the various defects evident in the last plan the Bronsons had proposed, which the court had ruled upon in January 2011 (over 14 months prior); and (3) the Bronsons' inability to demonstrate any tangible progress toward proposing and funding a new confirmable plan.

The following statement by the bankruptcy court is representative of the court's findings regarding the Bronsons' failure to address the issues critical to proposing and effectuating a confirmable plan:

It appears that there have been money judgments that . . . the State Court [has] entered against the Debtors [in the Nondisclosure Lawsuit]. I have no report or no understanding on the [Railroad Property] or any current marketing efforts.

It's -- I have no information on the collection of funds from the stock judgment. I have no indication that they -- the prosecution of a collection action or a liability action against the law firm Tidmore Lerma. There's no amended plan on file. There's no disclosure statement on file. Instead the clear preference is to continue to litigate against Mr. Thompson on his bankruptcy claim and that seems to also require a need to involve the FBI into this case. And I'm told that although the FBI has been talked about, apparently the Bronsons have not talked to the FBI in connection with

14

this matter.

I don't have a good answer to my question that we started this hearing with . . . . And that is, is there a viable Chapter 11 plan such to make it useful to continue this four year old litigation[?]

Hr'g Tr. (April 12, 2012) at 26:4-22.

**G.   The Bronsons' Reconsideration Motion**

On April 17, 2012, the bankruptcy court entered its order converting the case, and on April 27, 2012, the Bronsons filed a motion for relief from that order under Civil Rule 60(b) ("Reconsideration Motion").  While most of the Bronsons' arguments in the reconsideration motion reiterate their prior arguments, the Bronsons sought for the first time to present to the court an appraisal dated April 27, 2012, valuing the Office Building as of the date of TMT's foreclosure at $640,000 – far in excess of the amount owed to TMT at the time of foreclosure. Based on this new appraisal, the Bronsons made two new arguments: (1) that they clearly had a meritorious defense that would cause them to prevail in the Deficiency Lawsuit; and (2) that they now had grounds to assert a cause of action against TMT for unjust enrichment, because TMT otherwise would receive a windfall from his purchase of the Office Building based on a $200,000 credit bid.  In their reply in support of their Reconsideration Motion, the Bronsons further requested that the court recuse itself based on the Bronsons' perception of bias.

The bankruptcy court held a hearing on the Reconsideration Motion on June 1, 2012.  After finding no grounds to recuse itself, the bankruptcy court denied the Reconsideration Motion, in essence holding that the new information presented – the new

15

appraisal - would not have had any impact on the court's § 1112(b) ruling.

The bankruptcy court entered its order denying the Reconsideration Motion on June 5, 2012, and the Bronsons timely appealed on June 15, 2012.

**JURISDICTION**

The bankruptcy court had jurisdiction pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(A). We have jurisdiction under 28 U.S.C. § 158.

**ISSUES**

1. Did the bankruptcy court err when it converted Bronsons' chapter 11 bankruptcy case to chapter 7 pursuant to § 1112(b)(1)?

2. Did the bankruptcy court err in ruling on the Second Conversion Motion without first resolving the Deficiency Lawsuit?

**STANDARD OF REVIEW**

Historically, we have reviewed a bankruptcy court's decision to convert a chapter 11 case to chapter 7 for abuse of discretion. See, e.g., Greenfield Drive Storage Park v. Cal. Para-Professional Servs., Inc. (In re Greenfield Drive Storage Park), 207 B.R. 913, 916 (9th Cir. BAP 1997); Johnston v. Jem Dev. Co. (In re Johnston), 149 B.R. 158, 161 (9th Cir. BAP 1992). While the 2005 amendments to the Bankruptcy Code in some respects limited the bankruptcy court's discretion in this context, see In re Prods. Int'l Co., 395 B.R. 101, 108 (Bankr. D. Ariz. 2008), it still is appropriate in this appeal to conduct the same type of analysis we ordinarily utilize when reviewing the bankruptcy

16

court's exercise of its discretion.  Under the abuse of discretion standard, we first determine de novo whether the court identified the correct legal rule to apply.  And if the court identified the correct legal rule, we then review the court's findings of fact to determine whether those findings were "(1) 'illogical,' (2) 'implausible,' or (3) without 'support in inferences that may be drawn from the facts in the record.'" United States v. Hinkson, 585 F.3d 1247, 1261-62 (9th Cir. 2009) (en banc) (quoting Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 577 (1985)).

We also review for an abuse of discretion the bankruptcy court's decision not to continue the final hearing on the Second Conversion Motion until after resolution of the Deficiency Lawsuit.  See Orr v. Bank of Am., 285 F.3d 764, 783 (9th Cir. 2002); Khachikyan v. Hahn (In re Khachikyan), 335 B.R. 121, 125 (9th Cir. BAP 2005).

## DISCUSSION

As amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BACPA")[13] and the Bankruptcy Technical Corrections Act of 2010 ("BTCA"),[14] § 1112(b) generally requires a bankruptcy court to dismiss, convert, or appoint a chapter 11 trustee or examiner if it finds "cause."  See 11 U.S.C. § 1112(b)(1);[15] see also In re Prods. Int'l Co., 395 B.R. at

---

[13]Pub. L. 109-8, 119 Stat. 23 (Apr. 20, 2005).

[14]Pub. L. 111-327, 124 Stat 3557 (Dec. 22, 2010).

[15]Among other things, BTCA clarified that appointment of a trustee or an examiner was an additional alternative to
(continued...)

17

107-08; 7 COLLIER ON BANKRUPTCY, ¶ 1112.04[7] (Alan N. Resnick & Henry J. Sommer, eds., 16th ed. 2013).[16]

[15](...continued)
conversion or dismissal.  In this appeal, conversion is the only relevant alternative because the bankruptcy court found that conversion was in the best interests of creditors and because the Bronsons have not asserted on appeal that the bankruptcy court instead should have selected one of the other two alternatives to conversion.

[16]Upon finding cause, the court's obligation to dismiss, convert or appoint a trustee or examiner is not absolute. Section 1112(b) identifies certain exceptions to this general requirement.  The main exception is set forth in § 1112(b)(2), which provides that the court "may not" convert or dismiss a chapter 11 case notwithstanding the existence of cause if it "finds and specifically identifies unusual circumstances establishing that converting or dismissing the case is not in the best interests of creditors and the estate," and the following additional circumstances are established:

    (A) there is a reasonable likelihood that a plan will be confirmed within the timeframes established in Sections 1121(e) and 1129(e) of this title, or if such sections do not apply, within a reasonable period of time; and

    (B) the grounds for converting or dismissing the case include an act or omission of the debtor other than under paragraph (4)(A)--

    (i) for which there exists a reasonable justification for the act or omission; and

    (ii) that will be cured within a reasonable period of time fixed by the court.

At the hearing on the Second Conversion/Dismissal Motion, the bankruptcy court in essence found that there was not a "reasonable likelihood" of plan confirmation "within a reasonable period of time."  § 1112(b)(2)(A).  We perceive no error in this finding, nor have the Bronsons pointed us to any.  Thus, the exception set forth in § 1112(b)(2) does not apply under the facts of this case.

Here, the bankruptcy court correctly identified the two-step test it needed to consider in applying § 1112(b).  As the court put it, it first had to determine if cause existed to act under § 1112(b); and second, if cause existed, it had to determine which remedy, conversion or dismissal, was in the best interest of creditors.  See Nelson v. Meyer (In re Nelson), 343 B.R. 671, 675 (9th Cir. BAP 2006); see also In re Prods. Int'l Co., 395 B.R. at 108; 7 COLLIER ON BANKRUPTCY, supra, at ¶ 1112.04[7].

In finding "cause" sufficient to satisfy the first step of the two-step test, the bankruptcy court first noted that the types of cause enumerated in § 1112(b)(4) are not exhaustive, citing St. Paul Self Storage Ltd. P'ship v. Port Authority (In re St. Paul Self Storage Ltd. P'Ship), 185 B.R. 580, 582 (9th Cir. BAP 1995).  Indeed, we have held that bankruptcy courts enjoy wide latitude in determining whether the facts of a particular case constitute cause for conversion or dismissal under § 1112(b).  See Pioneer Liquidating Corp. v. U.S. Trustee (In re Consol. Pioneer Mortg. Entities), 248 B.R. 368, 375 (9th Cir. BAP 2000), aff'd, 264 F.3d 803 (9th Cir. 2001); see also In re Greenfield Drive Storage Park, 207 B.R. at 916.  This wide latitude is driven in part by common sense.  Having presided over the often lengthy and complex reorganization proceedings, the bankruptcy court has a familiarity with the parties and the issues that puts it in the best position to make the "cause" determination under § 1112(b).  In addition, the wide latitude afforded to bankruptcy courts is consistent with the legislative history accompanying § 1112(b): "'the court will be able to

19

consider other factors as they arise, and to use its equitable powers to reach an appropriate result in individual cases.'" In re Consol. Pioneer Mortg. Entities, 248 B.R. at 375 (quoting H. Rept. No. 95-595, 95th Cong., 1st Sess. 405-06 (1977), reprinted in 1978 U.S.C.C.A.N. 6362).

In determining whether cause exists under § 1112(b), the bankruptcy court must balance the debtor's continuing desire to remain in chapter 11 against the prospects for a successful reorganization. Even before all confirmation-related litigation has played out, when it becomes apparent to the court that the debtor will not be able to confirm and effectuate a plan within the foreseeable future, the bankruptcy court should exercise its discretion under § 1112(b) to dismiss or convert. See 7 COLLIER ON BANKRUPTCY, supra, at ¶ 1112.04[5].

This is precisely how the bankruptcy court here assessed the Bronsons' reorganization prospects. The bankruptcy court essentially found that the Bronsons were fixated on the Deficiency Lawsuit and had given no consideration to moving forward with a new plan in the fourteen months since the court had sustained TMT's objections to their amended plan. Moreover, the court noted that, even if the Bronsons ultimately were to prevail in the Deficiency Lawsuit, such success in and of itself would not enable the Bronsons to confirm and effectuate a plan. The Bronsons have not disputed that they had over $300,000 in general unsecured debt and over $100,000 in administrative expenses. And yet, when the court asked the Bronsons to provide information on the status and value of assets that potentially could fund their plan, the Bronsons basically ignored the court's

20

inquiry.

In sum, after four years in chapter 11 and over 14 months since the Bronsons' last attempt to confirm a plan, the Bronsons demonstrated an inability or unwillingness to move forward with the plan process without first resolving their disputes with TMT. The bankruptcy court's conclusion that this constituted "cause" under § 1112(b) was not illogical, implausible or without support in the record. See Hinkson, 585 F.3d at 1261-62. Accordingly, the bankruptcy court did not err in finding cause to convert.

On appeal, the Bronsons insist that they ultimately would have prevailed in the Deficiency Lawsuit, either by way of a favorable ruling on the Fee Issues or a favorable ruling on the FMV Issue, or both. According to the Bronsons, once they prevailed, both TMT's objection to their amended plan and TMT's motion to convert no longer would have been an obstacle to their reorganization efforts.

For purposes of this appeal, we are willing to assume without actually deciding that the Bronsons would have prevailed in the Deficiency Lawsuit. But even if they would have prevailed in that lawsuit, this would not establish that the chapter 11 issues – the plan defects and the Second Conversion/Dismissal Motion – would have simply disappeared. The Bronsons apparently believed that their success in the Deficiency Lawsuit would have established that TMT lacked standing. We disagree. Regardless of the outcome of the Deficiency Lawsuit, TMT already had an allowed claim for over $25,000 in the Bronsons' bankruptcy case. The Bronsons never appealed either the Gila Judgment or the Gila

21

Judgment Claim Allowance, from which TMT's allowed claim arose.[17]

By virtue of the Gila Judgment Claim Allowance, TMT was the holder of an allowed unsecured claim with a concrete stake in the outcome of the Bronsons' chapter 11 case and had standing to be heard on all aspects of the Bronsons' chapter 11 case. See § 1109(b). As a matter of law, the outcome of the Deficiency Lawsuit would not have altered the Gila Judgment or the Gila Judgment Claim Allowance because those were final judgments or orders that the Bronsons never appealed. See generally United Student Aid Funds, Inc. v. Espinosa, 130 S.Ct. 1367, 1376, 1380 (2010) (holding that bankruptcy court's final order was binding and that appellant could not later collaterally attack that order when the appellant had notice of the proceedings leading up to the entry of the order but never appealed the order). In short,

---

[17]After the bankruptcy court granted the Gila Judgment Claim Allowance, TMT filed a new proof of claim – Claim Number 20 – with a copy of the Gila Judgment Claim Allowance attached. Presumably, TMT filed Claim Number 20 to ensure that its allowed claim would appear on the claims register and be properly accounted for in the Bronsons' bankruptcy case. Remember, the Gila Judgment Claim Allowance arose not from a proof of claim but rather from TMT's motion for allowance of an administrative expense. The Bronsons duly opposed TMT administrative expense motion, but the bankruptcy court ultimately decided, after holding a hearing on the motion, to deny the claim as an administrative expense but allow it as a general unsecured claim. Without TMT's filing of Claim Number 20, TMT's allowed unsecured claim based on the Gila Judgment Claim Allowance would not have shown up on the claims register. We acknowledge that the Bronsons have filed an objection to Claim Number 20 and that the bankruptcy court has not yet disposed of this claim objection. Nonetheless, we know of no legal doctrine that would permit the Bronsons to collaterally attack the Gila Judgment Claim Allowance, a final order that was not appealed, by filing an objection to Claim Number 20.

22

TMT would not have lost his standing to be heard in the Bronsons' chapter 11 case even if the Bronsons had prevailed in the Deficiency Lawsuit.

The Bronsons' reliance on the Deficiency Lawsuit also is misplaced for a second, independent reason. Prevailing in that lawsuit might have freed the Bronsons from some of TMT's claims, but it would not have established their ability to fund or effectuate a confirmable chapter 11 plan. Put another way, even if the Bronsons successfully rid themselves of TMT's deficiency claim, the bankruptcy court had an independent duty to deny plan confirmation unless the plan requirements set forth in § 1129(a) were satisfied. Varela v. Dynamic Brokers, Inc. (In re Dynamic Brokers, Inc.), 293 B.R. 489, 498-99 (9th Cir. BAP 2003) (stating that bankruptcy courts have an independent duty to verify that all confirmation requirements are satisfied, regardless of whether a creditor objects). But the Bronsons had no answer for the bankruptcy court's questions and concerns regarding how they were going to propose and effectuate a confirmable plan of reorganization satisfying all of § 1129(a)'s requirements. At the hearing on the Second Conversion/Dismissal Motion, the court noted all of the defects that had prevented confirmation of the Bronsons' amended plan fourteen months prior, and the Bronsons were unable to explain how those defects would be remedied. All they did was point to their expectation that they ultimately would prevail in the Deficiency Lawsuit. As indicated by our discussion set forth above, the Bronsons' response was wholly inadequate to address the court's questions and concerns.

In sum, the Bronsons' expected outcome in the Deficiency

23

Lawsuit did not demonstrate that they were capable of confirming a viable plan in the foreseeable future or that conversion to chapter 7 was inappropriate.

The Bronsons only explicitly make one other argument in their opening brief: that, if the bankruptcy court had honored their evidentiary hearing requests, they would have been able to demonstrate to the court that TMT and his counsel were guilty of misconduct and concealment.

The Bronsons' evidentiary hearing argument is difficult to follow. The court did hold evidentiary hearings in the Deficiency Lawsuit. As best we can tell from their appeal brief, the Bronsons are upset because the bankruptcy court did not convene separate hearings to address their allegations that TMT and his counsel were guilty of misconduct and concealment. Specifically, the Bronsons contend that TMT and his counsel failed to make required disclosures under Civil Rule 26(a), failed to respond to their informal discovery requests, and did not have a legitimate factual basis for claiming that the FMV of the Office Building was equal to or less than the amount of TMT's credit bid.

As a threshold matter, we note that the Bronsons have not pointed us to, nor has our independent review of the record revealed, that the Bronsons ever filed in the bankruptcy court a discreet formal motion seeking sanctions under either Rule 9011 or under Rule 7037. In addition, it does not appear that the Bronsons ever complied with the procedural requirements of Rule 9011(b)(2).

But even if the Bronsons had satisfied the relevant

24

procedural requirements for relief under either Rule 7037 or 9011, they still have not explained how they thereby could have overcome the fact that their amended plan did not satisfy the requirements set forth in § 1129(a), or the fact that they did not appeal and could not collaterally attack the Gila Judgment Claim Allowance, which conclusively established TMT's standing as a creditor in the Bronsons' chapter 11 case.

Furthermore, most of the Bronsons' concealment/misconduct allegations do not withstand scrutiny. For instance, the Bronsons complain most about the alleged failure of TMT and his counsel to disclose facts concerning TMT's foreclosure and subsequent resale of a parcel of commercial real property located on Broad Street in Globe, Arizona ("Broad Property"). According to the Bronsons, TMT purchased the Broad Property in June 2008 at a foreclosure sale for a credit bid of $384,000 and resold the Broad Property to a third party in 2009 for $420,000 ("Broad Sale"). The Bronsons contend that the the Broad Sale established the value of the Broad Property, which in turn established the value of the Office Building, by "extrapolation." Therefore, the Bronsons conclude, TMT and his counsel should have disclosed the Broad Property and its sale in the Deficiency Lawsuit and in various relief from stay proceedings preceding the Deficiency Lawsuit.

We disagree with the Bronsons' analysis and conclusion for at least three reasons. First, just because the Bronsons believed that the Broad Property was comparable to the Office Building does not necessarily make it so for valuation and disclosure purposes. Second, relief from stay proceedings are

25

contested matters, and there is no Civil Rule 26(a) duty to disclose in contested matters. See Rule 9014(c). And third, to the extent TMT and his counsel generally had a duty to disclose in the Deficiency Lawsuit under Civil Rule 26(a), the Bronsons already were aware of the key facts regarding the Broad Property and the Broad Sale by the time they filed their Civil Rule 12(b)(6) motion to dismiss, as they recited those facts in their dismissal motion. Consequently, that the bankruptcy court did not enforce this supposed disclosure duty in the Deficiency Lawsuit was at worst harmless error, when the Bronsons obviously already knew the key facts regarding the Broad Property and the Broad Sale by the time they filed their dismissal motion. As an appellate court, we must ignore harmless error. See Litton Loan Serv'g, LP v. Garvida (In re Garvida), 347 B.R. 697, 704 (9th Cir. BAP 2006).

The Bronsons also suggest in their appeal brief that the bankruptcy court "rushed to convert" their chapter 11 bankruptcy case to chapter 7 while at the same time depriving them of an evidentiary hearing on the FMV Issue in the Deficiency Lawsuit. As we explained above, however, no aspect of the Deficiency Lawsuit was going to resolve in the Bronsons' favor the defects in their amended plan or the apparent cause for conversion under § 1112(b).

Moreover, the bankruptcy court record tells a much different story regarding why the Second Conversion/Dismissal Motion was heard before the FMV Issue. The Bronsons brought two motions in the Deficiency Lawsuit that explicitly sought relief based on the FMV Issue. The first was their Civil Rule 12(b)(6) motion filed

26

in November 2009. The court denied this dismissal motion, and the Bronsons have not argued on appeal that the bankruptcy court erred by denying their dismissal motion. Nor do we independently perceive any error in this ruling. The Bronsons did not again bring a motion focusing on the FMV Issue until March 2012, when they filed a motion for a judgment on the pleadings. In the interim between these two filings the litigants hotly contested the Fee Issues and largely ignored the FMV Issue. Significantly, in September 2010, when they were still represented by counsel, the Bronsons filed their own summary judgment motion focusing on the Fee Issues. If they were anxious to refocus attention on the FMV Issue, we do not understand why they did not address the FMV Issue in that motion. At a minimum, this would have forced TMT to come forward and provide some evidentiary support for his lower valuation of the Office Building.

Meanwhile, the Second Conversion/Dismissal Motion was filed in October 2010, but the bankruptcy court did not hear it until April 2012, roughly 18 months later. We cannot fathom how the Bronsons can characterize this as a "rush to judgment" on the motion to convert. In any event, the record reflects that the setting of hearings on the FMV Issue and on the Second Conversion/Dismissal Motion was not a unilateral decision of the court governed by whim, but rather was a function of the parties' conduct and how they chose to litigate their disputes.

The Bronsons devote none of their appellate brief to arguing that the bankruptcy court erred in denying their Reconsideration Motion or erred in denying the recusal request they made in their reply in support of their Reconsideration Motion. We decline to

address these issues because the Bronsons chose not to argue them on appeal.[18] See Brownfield v. City of Yakima, 612 F.3d 1140, 1149 n.4 (9th Cir. 2010) (citing Greenwood v. F.A.A., 28 F.3d 971, 977 (9th Cir. 1994)); Van Zandt v. Mbunda (In re Mbunda), 484 B.R. 344, 350 n.4 (9th Cir. BAP 2012).

**CONCLUSION**

For the reasons set forth above, we AFFIRM the bankruptcy court's conversion order and the bankruptcy court's order denying the Reconsideration Motion.

---

[18]Nonetheless, we note that the bankruptcy court carefully considered whether recusal was appropriate during the June 1, 2012 hearing on the Reconsideration Motion. Suffice it to say we perceive no error in this recusal analysis or in the court's decision against recusal.

28